Argued and submitted October 21, 2008, at Burns High School, Burns, affirmed
May 27, 2009

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

RAMONA E. DE LA ROSA,
aka Ramona Edilia Delarosa,
*Defendant-Appellant.*

Multnomah County Circuit Court
060130106; A133793

208 P3d 1012

————————————

David E. Groom argued the cause and filed the brief for appellant.

Katherine H. Waldo, Senior Assistant Attorney General, argued the cause for respondent. On the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Douglas F. Zier, Assistant Attorney General.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

SCHUMAN, J.

**SCHUMAN, J.**

After the trial court denied defendant's motion to suppress evidence that a police officer found in her automobile and apartment, defendant was convicted of manufacture, delivery, and possession of a controlled substance. She appeals, arguing, as she did at a pretrial hearing, that the searches violated Article I, section 9, of the Oregon Constitution in several respects.[1] We affirm.

The trial court found the following facts, which, because they are supported by evidence, we are bound to accept. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). Portland Police Officers had set up a drug enforcement operation involving a prearranged delivery of methamphetamine to a confidential reliable informant with whom they had worked "[s]everal times" before. While conducting surveillance at the apartment complex where he believed the delivery was to occur, Officer Passadore observed a silver Crown Victoria enter the parking lot and saw the driver talk to the informant. After the contact ended, the informant reported to Passadore that he had seen what he believed to be "at least two ounces" of methamphetamine inside the vehicle but that the event that Passadore had just witnessed was not the prearranged delivery. The officer chose not to stop the vehicle and to continue surveillance.

The next day, Passadore observed the same silver Crown Victoria in the same apartment complex parking lot. This time, however, Passadore stopped the vehicle after noticing what he believed to be two traffic violations: driving with windows that were too darkly tinted and failing properly to display a temporary license. Immediately upon contacting the driver—defendant in this case—Passadore noticed, suspended from defendant's rearview mirror, what he recognized as a so-called "Jesus Malverde" medallion,

---

[1] Article I, section 9, of the Oregon Constitution provides, in part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

We do not address defendant's argument under the Fourth Amendment to the United States Constitution because that argument fails to present a "thorough and focused" federal constitutional analysis on appeal. *State v. Thompson*, 328 Or 248, 254 n 3, 971 P2d 879, *cert den*, 527 US 1042 (1999).

which, based on his training and experience, he believed was "a cultural icon specifically related to narcotics trafficking in the Hispanic community."

Passadore asked defendant for her license, registration, and proof of insurance; she produced only an Arizona driver's license. He then asked her if she would step out of the vehicle to discuss "the violations and the reasons why she was pulled over," and she agreed. After some initial discussion about the basis for the traffic stop, Passadore asked defendant "if she had any weapons or any drugs on her person or within her car." She responded that she did not. Passadore then asked for permission to search the vehicle "for * * * evidence of weapons or drugs," and she consented.

When Passadore looked inside defendant's vehicle, he immediately saw, in plain view on the driver's side floorboard, a small plastic bindle containing white powder. At that point, he placed defendant under arrest. She confirmed that the bindle contained cocaine and that it belonged to her. Passadore continued his search of the vehicle and, in the trunk, he found a glass tube containing a powdery substance that he believed to be cocaine.

After finding the glass tube, Passadore asked defendant if she had any form of identification in addition to her Arizona driver's license. She told him that she had an Oregon driver's license in her apartment, and she offered to retrieve it. Passadore told her that, because she was under arrest and he suspected that there might be drugs in the apartment, she could enter only if she allowed him to accompany her. He also told her that she was not required to consent. She consented nonetheless, telling him that he could enter with her to retrieve the license and to "take a brief look around" for narcotics-related items. She also handed him her keys so that he could unlock the apartment.

Once inside, defendant identified her bedroom and said that her license was in her purse. With her consent, Passadore looked inside it, but he did not find the license. She then indicated a dresser drawer and suggested that Passadore look for her license there. In that drawer, Passadore found the license; he also found an open package of sandwich bags, a cut corner of a sandwich bag containing

what he believed to be methamphetamine residue, and several other cut sandwich bag corners. Passadore told defendant what he had seen. He also told her that he believed that drug activity was taking place in the apartment, that she was involved in that activity, and that he expected to find more evidence of drug activity there.

He then asked defendant for her consent to conduct "a more thorough" search of the apartment, explaining that he wanted to look "in cracks, crevices, pockets, places where narcotics-related items would actually be—attempted to be concealed from people finding them." Again, he advised her that she did not have to consent and that "she had the right to request that" he "go and apply for a search warrant with a judge." Defendant interrupted him and stated, "You can go ahead and search." In defendant's bedroom closet, Passadore found a wall safe and used a key on defendant's key ring to open it. Inside the safe, he found two small plastic bags tied at the end, both containing a crystalline substance that looked to him like methamphetamine, and a small electronic scale containing what he believed to be methamphetamine residue. Passadore asked defendant to identify what he had found. She replied, "Meth."

Defendant was charged with one count each of manufacture and delivery of a controlled substance, ORS 475.840(1)(b), and with two counts of possession of a controlled substance, ORS 475.840(3)(b). She moved to suppress "any and all evidence obtained as a result" of what she argued was an unlawful stop of her vehicle under Article I, section 9, including all physical evidence and statements. The trial court denied the motion, and defendant was subsequently convicted after a trial to the court.

On appeal, defendant argues, as she did below, that (1) the initial stop of her vehicle was unlawful; (2) Passadore's request for consent to search her vehicle for weapons and drugs was unlawful because it unnecessarily extended the stop's duration and was not supported by reasonable suspicion; (3) the trunk search exceeded the scope of any valid consent she had given; (4) her consent to search the apartment was coerced and, therefore, involuntary; and (5) the search of the wall safe exceeded the scope of any valid

consent she had given. We address each of those arguments in turn and reject all of them.

Defendant argues that the initial stop of her vehicle was unlawful for two reasons: first, because the stated basis for the stop—that is, Passadore's belief that defendant had committed traffic infractions—was not objectively reasonable; and, second, because that basis "was a complete pretext," manufactured by Passadore in order to accomplish a stop for a drug offense unsupported by reasonable suspicion. Defendant's first assertion is incorrect, and her second assertion, even if accurate, is nonetheless unavailing. Article I, section 9, requires that an officer who stops a person for a traffic infraction have probable cause to believe that the person has committed the infraction. *State v. Matthews*, 320 Or 398, 403, 884 P2d 1224 (1994). Probable cause has two components: the officer must subjectively believe that the violation has occurred, and that belief must be objectively reasonable. *Id.*

Here, the trial court found that Passadore subjectively believed that he had probable cause to stop defendant's vehicle for having illegally tinted windows, and we are bound by that finding of fact because there is evidence in the record to support it. *Ehly*, 317 Or at 75. Furthermore, ORS 815.222 provides that the operation of a vehicle with window tinting "not in compliance with or authorized by ORS 815.221," which specifies the degree of tint permissible, constitutes a traffic violation. It follows that Passadore's subjective belief that defendant had committed a traffic violation by operating a vehicle with "extremely dark" tinted windows, which, as the trial court found, prevented him from being able to "make out the silhouettes of anyone inside," was objectively reasonable. Moreover, because Passadore "had a right to be where he was when he observed the [window tint] violation," "he was authorized * * * to require the car to stop," regardless of whether his motive was to conduct a narcotics investigation. *State v. Carter/Dawson*, 287 Or 479, 485, 600 P2d 873 (1979). An "officer's motives for an otherwise justifiable traffic stop are * * * not relevant to the question of its validity." *Id.*; *accord State v. Bea*, 318 Or 220, 228 n 5, 864 P2d 854 (1993). Less elegantly put: Oregon law does not prohibit pretext stops.

■ Defendant's second argument is that Passadore's request for consent to search defendant's car was unlawful. We disagree. Questioning that occurs either after a lawful stop has ended or during an unnecessarily delayed stop is unlawful unless it is supported by reasonable suspicion. *State v. Rodgers*, 219 Or App 366, 371-72, 182 P3d 209, *rev allowed*, 345 Or 301 (2008). In the present case, we need not decide the status of the stop—ended, ongoing, delayed—because, in any event, Passadore had reasonable suspicion that defendant was involved in criminal activity at the time that the questioning began. Reasonable suspicion requires that an officer subjectively believe that a person has committed a crime and that the belief be objectively reasonable in light of the totality of the circumstances. ORS 131.605(5); *State v. Ehret*, 184 Or App 1, 7, 55 P3d 512 (2002). Reasonable suspicion is a less demanding standard than probable cause and may be based on reasonable inferences drawn from the circumstances and based on the officer's experience. *State v. Hames*, 223 Or App 624, 628, 196 P3d 88 (2008).

Passadore testified that he suspected defendant of possessing methamphetamine based on, among other things, information from a confidential reliable informant. Such information, we have recently held,

"must contain some indicia of reliability. *State v. Shumway*, 124 Or App 131, 133, 861 P2d 384 (1993), *rev den*, 318 Or 459 (1994). In *State v. Black*, 80 Or App 12, 19, 721 P2d 842 (1986), we identified three factors that are important in determining the reliability of a citizen informant's report. The first is whether the informant is exposed to possible criminal and civil prosecution if the report is false. That factor is satisfied if the informant gives his or her name to law enforcement authorities or if the informant delivers the information to the officer in person. *State v. Bybee*, 131 Or App 492, 495, 884 P2d 906 (1994). The second factor is whether the report is based on the personal observations of the informant. An officer may infer that the information is based on the informant's personal observations if the information contains sufficient detail that '[i]t is then apparent that the informant had not been fabricating [the] report out of whole cloth * * * [and] the report [is] of the sort which in common experience may be recognized as having been obtained in a reliable way * * *.' *Spinelli v. United States*,

393 US 410, 417-18, 89 S Ct 584, 21 L Ed 2d 637 (1969); *see Shumway*, 124 Or App at 136 (inferring personal know- ledge from level of detail in an informant's account). The final factor is whether the officer's own observations corrob- orated the informant's information. The officer may corrob- orate the report either by observing the illegal activity or by finding the person, the vehicle, and the location substan- tially as described by the informant. *Bybee*, 131 Or App at 495 (citing *State v. Vanness*, 99 Or App 120, 124, 781 P2d 391 (1989))."

*Hames*, 223 Or App at 628-29 (ellipses and brackets in *Hames*).

Applying those principles to the facts in this case, we conclude that the report from the confidential reliable informant that he had seen at least two ounces of metham- phetamine in the vehicle the day before was sufficiently reli- able to create an objectively reasonable suspicion that defen- dant was in possession of drugs. First, the officers conducting surveillance at defendant's apartment complex were in con- stant contact with the informant during their investigation and had worked with him several times before, finding him "[a]bsolutely" credible. In *Hames* terms, he personally deliv- ered the information to the officers. Second, the informant's report was based on his personal observation of the vehicle. Third, Passadore observed the informant's contact with the vehicle during which the informant claimed to have seen a quantity of drugs inside it; thus, the informant's contact with this particular vehicle was corroborated by Passadore's simultaneous observation.

Further, although the informant's observation occurred 24 hours before Passadore's encounter with defen- dant, the information was not "stale," that is, there was a reasonable inference that the evidence was still where the informant saw it. *See State v. Young*, 108 Or App 196, 204, 816 P2d 612 (1991), *rev den*, 314 Or 392 (1992) (defining "stale" information). Taking into account the relatively brief interval between observation and encounter and the fact that two ounces of methamphetamine is more than a person would consume in that interval, *see State v. Alvarez-Garcia*, 212 Or App 663, 665, 159 P3d 357 (2007) (noting that 13.2 grams of methamphetamine is enough for 52 individual uses), Passadore could reasonably have concluded that at

least some of the methamphetamine was still in defendant's car. *See Young*, 108 Or App at 204 ("[T]he information is not about possession of a small amount of [contraband] that would be consumed in a short period of time[.]"); *see also State v. Howell*, 93 Or App 551, 559, 763 P2d 179 (1988), *rev den*, 307 Or 405 (1989) (seven-year interval; information not too old to establish probable cause); *State v. Lillard*, 91 Or App 106, 111, 754 P2d 595, *rev den*, 306 Or 413 (1988), (seven-week interval; information not stale). The informant's information, we conclude, provided Passadore with reasonable suspicion that was adequate to justify questioning defendant.[2]

■ Third, we reject defendant's argument that Passadore's search of the trunk exceeded the scope of her consent to search the vehicle. The standard for determining the scope of consent is an objective one:

> "The scope of consent is not dependent on the subjective intent of the person granting consent but, rather, is determined by reference to what a 'typical, reasonable person would have understood by the exchange between the officer and the suspect * * * in light of the totality of the circumstances surrounding the grant of consent in a particular case.' *State v. Helow*, 171 Or App 236, 240-41, 15 P3d 103 (2000), *rev den*, 332 Or 56 (2001) (internal quotation marks omitted). When a request to search contains no limitations, and the defendant likewise places no limitations on the consent, the scope of that consent may be broad. *State v. Allen*, 112 Or App 70, 74, 826 P2d 127, *rev den*, 314 Or 176 (1992)."

*State v. Harvey*, 194 Or App 102, 106, 93 P3d 828, *rev den*, 337 Or 657 (2004) (omission in *Harvey*). Thus, in determining the scope of consent to search, we focus on the interchange between the requestor and the consenter; if the request mentions specific items, we pay particular attention to whether

---

[2] The state also relies on Passadore's observation of the "Jesus Malverde" medallion. We do not regard that observation as significant, and we do not consider it in our reasonable suspicion calculus, despite Passadore's detailed testimony about the training and experience he received regarding its import. That is so for at least two reasons. First, he stated under cross-examination that Jesus Malverde, in addition to being celebrated by drug dealers, is also celebrated by poor people in Latin America. Second, permitting officials to conduct otherwise unlawful searches based on a medallion that supposedly has significance only to Hispanics raises the same kind of serious constitutional concerns as other forms of profiling.

the search reaches places where a reasonable person would understand that those items might be found. *Allen*, 112 Or App at 74-75; *accord State v. Fugate*, 210 Or App 8, 17-18, 150 P3d 409 (2006). Accordingly, in *Allen*, 112 Or App at 73, 75, we held that, when the defendant granted the officer's request to "check the vehicle" for "weapons, narcotics, or large sums of money," the scope of the consent included the trunk. In *State v. Arroyo-Sotelo*, 131 Or App 290, 297-98, 884 P2d 901 (1994), on the other hand, we held that consent to search an automobile did not include consent to unscrew the door panels and look behind them. The situation here is clearly akin to the one in *Allen*. The court found that Passadore requested, and defendant granted, consent to "search the car for weapons and drugs." A reasonable person granting such consent would understand that her consent included the trunk.[3]

We also reject defendant's argument that her consent to the search of her apartment was involuntary because Passadore "had already placed [her] in custody at the time he asked for her consent." The fact that a defendant is in the custody of police officers does not, by itself, demonstrate that consent to search is involuntary. *See, e.g., State v. Reynolds*, 43 Or App 619, 623, 603 P2d 1223 (1979), *aff'd*, 289 Or 533, 614 P2d 1158 (1980). That fact is merely another factor in determining voluntariness. *State v. Flores*, 280 Or 273, 278-79, 570 P2d 965 (1977). The relevant inquiry is whether, under the totality of the circumstances, the consent was given by an act of free will or was the result of coercion, express or implied. *State v. Hall*, 339 Or 7, 20, 115 P3d 908 (2005). Here, before obtaining defendant's consent both to "take a brief look around" the apartment for narcotics-related items and, later, to perform "a more thorough" search for

---

[3] In any event, the seizure of evidence from defendant's trunk was not prejudicial, because that evidence—a glass tube containing a powdery substance that Passadore believed to be cocaine—was not tested or admitted at trial. Defendant's convictions were based on the drugs and drug packaging materials found inside defendant's apartment (Counts 1, 2, and 3) and the bindle of cocaine found on the floorboard in defendant's vehicle (Count 4). It follows that any error in the trial court's consideration of Passadore's testimony regarding his observation and seizure of the glass tube in the trunk is highly unlikely to have affected the court's verdict. Or Const, Art VII (Amended), § 3 (reviewing court shall affirm a conviction despite legal error during trial if the error was harmless); *see State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (stating standard for harmless error).

such evidence, Passadore informed defendant that she was not required to consent. Moreover, before asking for defendant's consent to the "more thorough" search, he advised defendant that "she had the right to request that" he "go and apply for a search warrant with a judge." There being no other evidence concerning coercion, we conclude that defendant's consent was voluntary in both instances.

█ Lastly, we reject defendant's argument that the search of the wall safe in her bedroom closet exceeded the scope of her consent to perform a search of those "cracks, crevices, [and] pockets * * * [in the apartment] where narcotics-related items" might be found. As noted above with respect to the consent to search the trunk of defendant's car, the scope of a defendant's consent to search generally includes "those areas where the items that are the subject of the search might be found." *Arroyo-Sotelo*, 131 Or App at 297. Here, defendant had previously given Passadore her keys so that he could enter the apartment, and she had not asked for them to be returned. Passadore asked defendant for consent "to take a more thorough look through the house, explaining that by thorough [he] meant looking in cracks, crevices, [and] pockets * * * where narcotics-related items" were likely to be found, and defendant responded, "You can go ahead and search." The trial court was thus correct in concluding that, given Passadore's preliminary remarks explaining that defendant was not required to consent, "one would reasonably assume, and he's got her keys, that [the search] would include every place where, [as] he has explained it to her, narcotics [and evidence of narcotics trafficking] could reasonably be kept * * * and * * * that certainly would include a wall safe." The search was within the scope of defendant's consent because Passadore explained exactly what he was looking for and that the search would be "thorough," defendant consented without limitation, and a wall safe constitutes a place where the sought-for evidence was likely to be found.

Affirmed.