Argued and submitted November 25, 2008; orders dated February 7, 2006, suppressing evidence of items seized following search of 2310 N. Killingsworth, Portland, vacated; portions of orders dated February 8, 2006, granting defendants' motions to suppress, reversed, otherwise affirmed; case remanded for reconsideration November 18, 2009

## STATE OF OREGON,
*Plaintiff-Appellant,*

*v.*

## DION LEAQUONE BAKER,
*Defendant-Respondent.*

Multnomah County Circuit Court
0112-38477; A131574 (Control)

## STATE OF OREGON,
*Plaintiff-Appellant,*

*v.*

## DERRICK JERMAINE JAY,
*Defendant-Respondent.*

Multnomah County Circuit Court
0112-38476; A131575

221 P3d 749

Janet A. Klapstein, Senior Assistant Attorney General, argued the cause for appellant. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

David Ferry, Deputy Public Defender, argued the cause for respondent Dion Leaquone Baker. With him on the brief

was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Rankin Johnson IV argued the cause and filed the brief for respondent Derrick Jermaine Jay.

Before Landau, Presiding Judge, and Ortega, Judge, and Carson, Senior Judge.

ORTEGA, J.

## ORTEGA, J.

In this consolidated case involving two codefendants, Baker and Jay, the state appeals four pretrial orders suppressing the testimony of a police officer and other evidence. ORS 138.060. In two cross-assignments of error, defendant Jay challenges the trial court's denial of his motion to suppress evidence discovered during a traffic stop and evidence of jail visitation logs created after his arrest. We vacate two of the orders in their entirety, reverse two others in part, and remand for further proceedings.

## I. FACTS

On June 16, 2001, the driver of a blue car shouted derogatory and racist remarks at a mixed-race couple as the couple stood in front of their Portland apartment. When one of the victims told the driver that he "shouldn't say that," the driver pulled over, got a gun from the car's trunk, pointed it at the couple, and instructed them to leave the neighborhood. The couple left the area, then returned. They later discovered that the tires of their own car had been slashed.

One of the couple's neighbors witnessed both the confrontation and the tire-slashing incident and called the police after the second incident. The neighbor told police that the perpetrators of the initial threat had been involved in slashing the couple's tires. She identified the car as a "Chev[rolet] Celebrity, four-door, slate blue in color" and provided a partial license plate number.

The couple decided to move out of their apartment. They did so several days later, with a police officer present to ensure their safety. While the officer was outside the couple's apartment, the couple's neighbor told the officer that the car driven by the perpetrators was parked nearby. After one of the victims confirmed that the car was the one involved in the menacing incident, the officer researched the car's full license plate number in the police data system and discovered that one of the defendants, Baker, was associated with the car.[1]

---

[1] Stradley testified in an offer of proof that Baker had been ticketed while driving the car. All the other officers used the phrase "associated with the vehicle" or a similar variant.

On June 21, five days after the original incident, two masked and armed suspects broke into a North Portland home. They hit one of the occupants with a gun, stole cash, and stole a rental car parked in the home's driveway. The victims gave descriptions of the robbers to the police. The stolen car was recovered the next day at a location near both the scene of the robbery and the duplex where defendants were staying at the time.

In the meantime, officers Santos and Stradley had begun investigating the menacing incident and conducted surveillance at the residence where the blue Celebrity had been seen. Information gathered during that surveillance led to three traffic stops on June 22, 2001—one stop of the Celebrity with which Baker was associated and two traffic stops of a gray Chevrolet Caprice.

The first stop of the Caprice occurred shortly after noon. After Santos observed the car near the residence that was under surveillance, he directed another officer, Staul, to stop the car on the ground that the windows were excessively tinted. Staul conducted the stop and made contact with defendants, but they were neither cited nor detained at that time.

Approximately one hour later, Santos asked Staul to stop the Celebrity that police suspected was involved in the menacing incident; the basis for the stop was that the car's driver had failed to stop for a red light. Staul conducted the traffic stop and, several minutes later, was joined by Santos, who obtained the consent of the driver, Foster, to search the car for weapons. The officers did not find any weapons in the car but found three citations in the glove box, including one dated 12 days earlier showing that defendant Baker had been operating the car. The final encounter, in which officers again stopped the Caprice, occurred later that afternoon and resulted in defendants' arrest.

After defendants' arrest, police eventually obtained 10 search warrants relating to their investigation of defendants. The initial warrants authorized searches of the Caprice in which defendants had been arrested and the residence in which they had been seen shortly before their arrest. The discovery during those searches of a mask, gloves, and

clothing, as well as information gathered from defendants after their arrest, led to additional warrant searches, including a warrant search of the home of defendant Jay's girlfriend, Thompson, which resulted in the discovery of two firearms. Analysis of those firearms and of the evidence discovered in the Caprice connected defendants with the unsolved June 21 robbery. Defendants were charged with various drug and firearms-related offenses in federal court, as well as several robbery and firearms-related offenses in state court.

Based on the federal charges against them, defendants originally were held in federal custody. On at least two occasions, the state obtained a writ of habeas corpus *ad prosequendum* from the state circuit court, ordering federal officials to transport Baker from a federal facility to Multnomah County Circuit Court.[2] The state proceedings against defendants were held in abeyance pending the outcome of the federal litigation. After defendants were convicted in federal court, the state court scheduled a hearing for December 12, 2005, on defendants' motions to suppress evidence.

Several days before the hearing, federal officials transported defendant Baker from Oregon to a federal facility in Oklahoma. Despite being aware of the scheduled hearing, the state failed to obtain a writ specifically ordering Baker's transport from that facility. Federal officials indicated that they were unable to return Baker to Oregon until early January.

At the December 12 hearing, the prosecutor acknowledged that the state had been responsible for ensuring defendant Baker's attendance and that it had failed to do so. Counsel for defendant Baker declined to proceed in

---

[2] Historically, writs of habeas corpus *ad prosequendum* were issued directly by a court of the jurisdiction in which an indictment or complaint was lodged against a prisoner and constituted a court order requesting the prisoner's appearance to answer charges in the summoning jurisdiction. *Stewart v. Bailey*, 7 F3d 384, 389 (4th Cir 1993). In contrast, writs of habeas corpus *ad subjiciendum* were used to inquire into the illegal detention of a prisoner. *Fay v. Noia*, 372 US 391, 399-400, 83 S Ct 822, 9 L Ed 2d 837 (1963). Writs *ad prosequendum* have been abolished in this state. *See* ORS 34.310 (abolishing all writs of habeas corpus except the writ *ad subjiciendum*); *see also State ex rel. Gladden v. Lonergan*, 201 Or 163, 199, 269 P2d 491 (1954) (Lusk, J., specially concurring). We assume that the state sought writs *ad prosequendum* in this case pursuant to federal requirements.

Baker's absence. Defendants instead moved to dismiss the indictments based on the state's failure to ensure Baker's attendance. In addition to defendant Baker's absence, Stradley was on vacation and therefore also failed to comply with defendants' subpoenas to attend the December 12 hearing.

The trial court denied defendants' motion to dismiss the indictments and, acting on its own motion, set over the suppression hearing until January. Defendants then sought to exclude Stradley's testimony at the January hearing, arguing that, but for the state's failure to arrange for defendant Baker's transport, the December 12 hearing would have gone forward without Stradley's testimony; defendants argued that the state should not benefit from its neglect in regard to defendant Baker by having the benefit of that testimony at the January hearing. The trial court delayed ruling on that motion until the hearing resumed.

When the hearing resumed over a 13-day period in January, defendants renewed their motion to exclude Stradley's testimony. Stradley was present and testified about his earlier failure to comply with defendants' subpoenas. He explained that, at the time of the initial hearing, he had been on vacation in Arizona. He acknowledged that, before making his vacation request, he had checked his calendar and noticed that he had been subpoenaed in this case, but explained that the Portland Police Bureau's calendar system did not identify which party had subpoenaed him. Stradley explained that he had spoken with the district attorney regarding the "time frame" in this case, and it was his understanding that "everything had been set over until the 30th of January [2006]." Based on his understanding that there were no proceedings in the case until January 30, in late November, Stradley requested vacation time and, until he was contacted on the morning of the suppression hearing, he was not aware that a hearing had been scheduled for December 12.

The trial court determined that the state had the responsibility for arranging Baker's transportation to the suppression hearing, that it had successfully done so in the past, and that its failure to do so in regard to the December 12

hearing, although not malicious and not rising to the level of prosecutorial misconduct, was "more than negligent." The trial court further determined that Stradley had been validly subpoenaed and that, despite his knowledge of the subpoena, he "willfully" chose not to appear.[3] The court noted that, had the hearing occurred on December 12, the court would not have permitted Stradley to testify telephonically and would not have granted a continuance to allow him to return to offer testimony. The court therefore excluded Stradley's testimony and the testimony of the other officers to the extent that it was based on information acquired from him:

> "My ruling is this: Where we have someone who is subpoenaed by a criminal defendant to be here to testify and they don't show up at the start of the hearing, the ruling is they don't testify in the hearing. Period. They don't testify in the hearing. That's not a sanction to the State[,] that is the Court's ruling as what happens when a witness doesn't show up when they have been subpoenaed by a criminal defendant."

The trial court further reasoned that, but for the state's neglect in transporting Baker, the hearing would have occurred on December 12 and that defendants were entitled to be placed in the position that they would have been in on that date. The court later reiterated its ruling:

> "But in considering all of the possible courses of action here, the Court in its inherent authority to control the proceedings here and make sure they happen in an orderly fashion and that all of the parties' rights are protected, the appropriate remedy here is to put us back in the position we would have been on December 12th and proceed with the cast of witnesses who had responded to the subpoenas and were available at that date. So that is what we're going to do here.
>
> "* * * * *
>
> "And the Court does find that the State would, after listening to the offer of proof, the State would be in a better position than they would have been on December 12th. And the State is not entitled to benefit from their failure to have

---

[3] The trial court's factual findings are supported by evidence in the record and are binding on this court. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968).

Defendant Baker transported and have us go forward on December 12th."

The court further determined that the officers' search of the glove box of the Celebrity exceeded the scope of Foster's consent to search that car; that the traffic stop and related search and arrest of defendants were unlawful; and that the warrant search of the Caprice car in which they were stopped was not supported by probable cause. The trial court therefore also suppressed the evidence found in the glove box, the evidence seized following defendants' warrantless arrest, the evidence discovered in a post-arrest warrant search of the Caprice that defendants were driving at the time of their arrest, and the evidence discovered during the warrant search of Thompson's home and later warrant searches.

On appeal, the state assigns error to each of the described rulings. As noted, defendant Jay asserts two cross-assignments of error, challenging the trial court's denial of his motion to suppress evidence discovered after officers conducted a traffic stop based on their mistaken belief that he was driving a car with illegally tinted windows, and the trial court's denial of his motion to suppress evidence of jail visitation logs created after his arrest.

## II. EXCLUSION OF OFFICER STRADLEY'S TESTIMONY AND DERIVATIVE EVIDENCE

For reasons that will become apparent, we begin with the state's second assignment of error on appeal. In that assignment, the state argues that, in excluding Stradley's testimony and related evidence, the trial court exceeded both its express authority under ORS chapter 33 to impose sanctions for direct or indirect contempt of court and its inherent authority to regulate proceedings before it. We review the trial court's ruling for errors of law. We first consider whether the trial court properly excluded Stradley's testimony, based on his failure to appear in response to defendants' subpoenas, and conclude that that ruling was in error.

Courts are authorized to enforce subpoenas through the contempt power:

"Disobedience to a subpoena or a refusal to be sworn or answer as a witness may be punished as contempt by a

court before whom the action is pending or by the judge or justice issuing the subpoena. Upon hearing or trial, if the witness is a party and disobeys a subpoena or refuses to be sworn or answer as a witness, such party's complaint, answer, or reply may be stricken."

ORCP 55 G; *see* ORS 136.600 (ORCP 55 G applies in criminal proceedings); *State v. Cartwright*, 173 Or App 59, 66 n 9, 20 P3d 223 (2001), *rev'd on other grounds*, 336 Or 408, 85 P3d 305 (2004) ("The enforcement mechanism for a subpoena is the court's contempt power."). By providing for contempt as an enforcement mechanism, ORCP 55 G gives courts authority to compel a witness to appear at a proceeding and, alternatively, to punish a witness for failure to appear. *See State v. Thompson*, 57 Or App 281, 285, 644 P2d 608 (1982), *rev'd on other grounds*, 294 Or 528, 659 P2d 383 (1983) (the purpose of a court's contempt power is to "enforce court orders or to punish violations of court orders").

■■ It is true that the use in ORCP 55 G of the word "may" suggests that, when confronted with a witness who has not complied with a subpoena, a court retains authority to decline to institute contempt proceedings. *See Farmer v. Baldwin*, 346 Or 67, 78-79, 205 P3d 871 (2009) (the use of the word "may" is indicative of a grant of discretion). However, when the circumstances of a case fall within the subject matter addressed by ORCP 55 G, although a trial court has discretion not to institute contempt proceedings, it is not free to employ procedures or remedies other than those provided by the legislature. Rather, the court's action must be consistent with the goals of that statute: obtaining the witness's appearance at the proceeding, punishing the witness's noncompliance, or both. Excluding a nonparty witness's testimony is not consistent with either of those goals. Rather, such a remedy in effect ratifies the witness's noncompliance by permitting him to continue not to appear and, in effect, punishes the party or parties who sought the witness's testimony.

Such a remedy also undermines the principle, long recognized by both the legislature and the courts, that persons who have been subpoenaed in criminal cases are obligated to appear and offer testimony. *See* ORS 136.555 (a criminal subpoena is the "process by which the attendance of

a witness before a court or magistrate is required"); *Dunwoody v. Handskill Corp.*, 185 Or App 605, 618, 60 P3d 1135 (2003) (compliance with a subpoena in a criminal case is an important public duty); *cf.* ORCP 55 A (a subpoena is "a writ or order directed to a person and may require the attendance of such person at a particular time and place to testify as a witness on behalf of a particular party therein mentioned"); *see also Blackmer v. United States*, 284 US 421, 438, 52 S Ct 252, 76 L Ed 375 (1932) (properly summoned citizens have a duty to attend court and give testimony). In recognition of that principle, the legislature has authorized sheriffs to take extraordinary steps to serve subpoenas and has enacted legislation to protect witnesses from intimidation. *See* ORS 44.150 (authorizing and requiring a sheriff or designee to break into a building where a witness may be concealed in order to serve a subpoena); ORS 162.285 (conduct of inducing or attempting to induce a subpoenaed witness not to appear at proceeding to which witness has been subpoenaed constitutes crime of witness tampering).

Defendants contend that the trial court properly excluded Stradley's testimony and related evidence based on Stradley's failure to comply with their subpoenas because his absence violated their constitutional rights, under Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution, to compulsory process, and to confront the witnesses against them. Defendants reason that their elicitation of testimony from Stradley on cross-examination would have supported their positions as to the unlawfulness of the relevant stops, arrests, and searches and seizures of evidence. Defendants do not explain, however, how the suppression of Stradley's testimony and related evidence vindicated the identified constitutional rights, nor do we understand how that logically is the case. We reject that argument without further discussion.

For the above reasons, the trial court erred in excluding Stradley's testimony and related evidence based on Stradley's failure to comply with defendants' subpoenas.

■ We turn to whether the trial court nevertheless had inherent authority to exclude Stradley's testimony and

related evidence based on the state's failure to secure defendant Baker's presence at the hearing. Again, the trial court reasoned that the state's conduct in that regard, although not malicious, was "willful and intentional" and "more than negligent," because "this case has a long history of many proceedings where [defendant Baker] had been transported." The trial court concluded that "the appropriate remedy here is to put us back in the position we would have been [in] on December 12th and proceed with the cast of witnesses who responded to the subpoena and were available on that date."

■ Trial courts have inherent power to control ongoing proceedings in order to ensure that those proceedings occur properly and expeditiously. *See, e.g.*, ORS 1.010 (every court has the power to enforce order in the proceedings before it and to control, in the furtherance of justice, the conduct of persons connected with judicial proceedings); *State v. Mains*, 295 Or 640, 656, 669 P2d 1122 (1983) (giving examples of actions a trial court may take as part of its obligation to conduct fair and efficient proceedings). That inherent authority of trial courts, although broad, is not unlimited. For example, as discussed above in relation to the trial court's imposition of an exclusionary sanction based on Stradley's failure to comply with a subpoena, a trial court's inherent power may not be exercised in a manner contrary to legislative directives as to the conduct of the judicial function. *See Ortwein v. Schwab*, 262 Or 375, 385, 498 P2d 757 (1972), *aff'd*, 410 US 656, 93 S Ct 1172, 35 L Ed 2d 572 (1973) ("the doctrine of inherent judicial power [is] the source of power to do those things necessary to perform the judicial function [and] for which the legislative branch has not provided"). As particularly pertinent here, the appellate courts of this state recognize various constraints on the authority of trial courts under ORS 135.865 to exclude evidence based on violations of the criminal discovery statutes[4] and on the authority of trial courts to

---

[4] ORS 135.865 provides:

"Upon being apprised of any breach of the duty imposed by the provisions of ORS 135.805 to 135.873 and 135.970 [the criminal discovery statutes], the court may order the violating party to permit inspection of the material, or grant a continuance, or refuse to permit the witness to testify, or refuse to receive in evidence the material not disclosed, or enter such other order as it considers appropriate."

impose exclusionary sanctions based on violations of a defendant's rights under the state and federal constitutions—for example, the rights against unreasonable searches and seizures and compelled self-incrimination.

As to statutory discovery violations, in *State v. Mai*, 294 Or 269, 656 P2d 315 (1982)—which involved a discovery violation by the defendant and the defendant's subsequent challenge to the constitutionality of the witness exclusion sanction provided in ORS 135.865—the Supreme Court explained that a trial court's authority to impose an exclusionary sanction is constrained by two considerations. First, the court must determine that the party denied discovery has been prejudiced by the other party's failure to comply with the discovery statutes. Second, it must appear that *"no sanction short of preclusion* effectively will avoid the prejudice which the [other party's] lack of compliance created." *Id.* at 280 (emphasis added); *see also State v. Ben*, 310 Or 309, 318, 798 P2d 650 (1990) (although the defendant had committed discovery violations, where the record did not demonstrate, and the trial court did not find, that a lesser sanction would not avoid any prejudice, trial court erred in excluding the evidence).

As to exclusionary sanctions imposed for violations of defendants' state constitutional rights against unreasonable search and seizure, the Supreme Court explained in *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983), that the rationale underlying Oregon's exclusionary rule is to vindicate those "personal rights" by denying the state the use of evidence procured *as a result of such a violation*, thereby effectively restoring the citizen to the position that she would have been in had the state's officers remained within the limits of their authority. *Accord State v. La France*, 219 Or App 548, 555, 184 P3d 1169 (2008).[5] Similarly, the right under Article I, section 12, not to be compelled to provide testimony

---

[5] *Cf. United States v. Calandra*, 414 US 338, 348, 94 S Ct 613, 38 L Ed 2d 561 (1974) (the federal exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect"; because of remedial nature of federal rule, courts must "weigh the likely social benefits of excluding unlawfully seized evidence against the likely costs" to determine whether it applies (citing *INS v. Lopez-Mendoza*, 468 US 1032, 1041, 104 S Ct 3479, 82 L Ed 2d 778 (1984))).

or furnish evidence against oneself by its express terms constitutes an exclusionary rule that prohibits the use of testimonial evidence acquired *as a result of its violation*, as well as protecting a person from being compelled in the first instance to furnish evidence. *State v. Vondehn*, 219 Or App 492, 509-10, 184 P3d 567, *rev allowed*, 345 Or 460 (2008); *see also State v. Burdge*, 295 Or 1, 14, 664 P2d 1076 (1983) (exclusion of witness testimony based on an inadvertent violation of an order to exclude witnesses from the courtroom was reversible error).[6]

■ Analogizing to those settled principles, we first conclude that, because the trial court continued the December 12 hearing until January, when defendant Baker was able to be present, Baker ultimately was not prejudiced by the state's failure to arrange his transport.[7] Additionally, the record does not demonstrate that the trial court considered any lesser sanctions than exclusion of Stradley's testimony and related evidence.[8] Most significantly, even assuming that defendant Baker had a right to be present at the pretrial suppression hearing and that the state's conduct in failing to arrange his transport in effect "violated" that right, the

---

[6] *See also* ORS 136.432 (a trial court may not exclude relevant and otherwise admissible evidence on the grounds that it was obtained in violation of any statutory provision unless exclusion of the evidence is required by the state or federal constitution, a rule of evidence governing privileges or the admission of hearsay, or the rights of the press); *State v. Bloom*, 216 Or App 245, 249, 172 P3d 663 (2007), *rev den*, 344 Or 280 (2008) (unless the legislature has created an express exclusionary remedy for a statutory violation, a court may not exclude relevant and otherwise admissible evidence simply because it was obtained in violation of a statute). We have not identified any statute establishing an exclusionary remedy for a violation of the statutes relating to subpoenas of witnesses. In any event, as discussed above, in this case, the evidence was not obtained as the result of the relevant violation.

[7] A trial court may decline to grant a motion for a continuance in order to prevent a delay in the prosecution of a case, so long as the court's refusal is reasonable under the circumstances of the case. *Compare State v. Parker*, 317 Or 225, 231-32, 855 P2d 636 (1993) (where the defendant had already obtained three continuances and had had sufficient time to arrange for expert testimony, the trial court did not abuse its discretion when it refused to grant a fourth continuance for the defendant to arrange expert testimony), *with State v. Hickey*, 79 Or App 200, 203-04, 717 P2d 1287 (1986) (the trial court abused its discretion when it denied the defendant's motion for a continuance after the defendant's attorney's briefcase, which contained all the material pertinent to the defense, was stolen on the eve of trial).

[8] Although the trial court set the hearing over, that action was remedial and not punitive in nature; we therefore do not treat it as a lesser sanction for the purpose of our analysis.

evidence that the trial court excluded was not discovered as a result of that violation. For all those reasons, we conclude that, in the circumstances presented here, the trial court exceeded its inherent authority to control the proceedings when it excluded Stradley's testimony and related evidence.

Accordingly, the trial court erred in granting defendants' motions to exclude Stradley's testimony and related evidence.

### III. THE SECOND STOP OF THE CAPRICE, DEFENDANTS' ARREST, AND THE RESULTING SEARCH WARRANTS

In its third, fourth, and fifth assignments of error, the state argues that the trial court erred in concluding that the warrantless stop, seizure, and arrest of defendants was unlawful for lack of reasonable suspicion or probable cause, that the warrant search of the Caprice that defendants occupied at the time of their arrest was unlawful for lack of probable cause, that the warrant search of Thompson's residence and subsequent warrant searches were unlawful in light of the unlawfulness of defendants' arrest, and that the court therefore erred in suppressing all the resulting evidence. As demonstrated by the state's combined argument on those assignments and defendants' responses, the correctness of the trial court's rulings on those matters depends at least in part on the correctness of the trial court's suppression of Stradley's testimony and evidence derived from it. Because we have determined that the trial court erred in that regard and because, on remand, the trial court may reach different conclusions on the matters at issue in these assignments of error, we do not address them.

### IV. CONSENT SEARCH OF BLUE CHEVROLET CELEBRITY

■ Finally, in its first assignment of error, the state contends that the trial court erred in suppressing evidence of three documents found in the glove box of the blue Chevrolet Celebrity following a consent to search by Foster, the Celebrity's driver. The trial court stated that its factual findings pertaining to the traffic stop would be consistent with

those made by the federal district court. That court found as follows:

> "Officer Santos asked Officer Staul to stop the vehicle on the pretext of investigating the traffic violation. Officer Staul identified the driver as * * * Foster, ended the traffic stop within five minutes, and told Foster she was free to go.
>
> "Before Foster left, however, Officer Santos approached her, identified himself as a police officer, told her he was investigating a gun crime involving the blue Chevrolet Celebrity she was driving, and asked her if she knew [defendant] Baker. Foster said she had driven the Celebrity for only two days. Foster denied knowing [defendant] Baker and denied any men had been to her residence recently. After Foster gave Officer Santos consent to search the blue Chevrolet Celebrity, he found a traffic citation in the glove box dated June 6, 2001, that identified Baker as the driver of the blue Chevrolet Celebrity on that date. Officer Santos also found two other papers with [defendant] Baker's name on them."

Because the trial court's findings are supported by evidence in the record, they are binding on this court.[9] *Ball*, 250 Or at 486-87.

The trial court excluded the documents discovered in the search, explaining that, although the state had established that Foster consented to a search of the interior of the

---

[9] At the hearing in this case, Santos testified:

"I just explained to [Foster], you know, 'I'm a police officer. I'm investigating an incident that happened a few days prior involving this vehicle, and I'd like consent to search it,' which she granted.

"Talked to her about whose vehicle it was, who had been driving it. She said that the car belonged to someone named Jenny, who's from Vancouver. * * *

"* * * * *

"I spoke with her about [defendant] Baker. She said she did not know [defendant] Baker, never heard of [defendant] Baker. I confronted her with the fact that—talked to her about the initial incident that I was investigating, and described to her that some people were saying—this being the victims in this case—that he may have been involved in this incident, and I would like consent to search. She granted consent."

Although Santos did not expressly state in his testimony that he told Foster that the incident that he was investigating involved a gun, we conclude that it was reasonable to infer, as the trial court did in its findings of fact, that Santos told Foster that the crime that he was investigating involved a gun.

car, "the state ha[d] not met its burden of showing that [the consent to search] included a search of the closed glove box."

On appeal, the state argues that the trial court erred because a reasonable person with whom the police have discussed a gun-related offense involving a car, having been asked to consent to a search, would understand that the police were searching "for that gun and any evidence linking Baker to the car that [had] been positively identified by the victims." Defendants respond that the record does not clearly establish that Santos informed Foster of the objects of his search and, accordingly, there is insufficient evidence in the record to determine that her consent to search included the glove box. Defendants also offer an alternative basis for affirmance, contending that the state offered no evidence that Foster had actual authority to consent to a search of the glove box. We agree with the state that the scope of Foster's consent included the glove box and reject defendants' argument that Foster did not have actual authority to consent to a search of the glove box.

 Ordinarily, for a search to be permissible under Article I, section 9, of the Oregon Constitution, it must be conducted pursuant to a search warrant. *State v. Paulson*, 313 Or 346, 351, 833 P2d 1278 (1992). However, warrantless searches are reasonable if they fall within one of the recognized exceptions to the warrant requirement. One such exception is consent. *Id.* As we have explained,

> "[w]hen the state relies on consent to support a search, it must prove by a preponderance of the evidence that officials complied with any limitations on the scope of the consent. The scope of a person's consent does not turn on what the person subjectively intended. Rather, it turns on what a reasonable person would have intended. The specific request that the officer made, the stated object of the search, and the surrounding circumstances all bear on our determination of the scope of a person's consent."

*State v. Fugate*, 210 Or App 8, 13, 150 P3d 409 (2006) (citations omitted). Once the facts have been determined, the scope of consent is a question of law. *State v. Arroyo-Sotelo*, 131 Or App 290, 294, 884 P2d 901 (1994). Generally, when a police officer specifies the subject of a search, "the scope of

[the] consent * * * should be interpreted to include those areas where the items that are the subject of the search might be found." *Id.* at 297.

*State v. Harvey*, 194 Or App 102, 93 P3d 828, *rev den*, 337 Or 657 (2004), is illustrative. In that case, police officers visited a residence as part of a robbery investigation. One officer remained on the front porch as the other officer walked toward the side of the residence, where he discovered the defendant and a companion seated in a parked car in the driveway. The officer noticed a "strong" marijuana odor emanating from the car and asked its occupants what they were doing. Before they could answer, however, the first officer asked the second officer to return to the house. *Id.* at 104.

As the officer approached the residence—accompanied by the defendant and his companion—the first officer explained that he had found drug paraphernalia in the house. The second officer then asked whether he could search the car in which the defendant had been sitting. The defendant consented to the search, telling the officer, "Go ahead." A search of the car's passenger compartment revealed a backpack that smelled like marijuana. When the officer opened the backpack, he found a small velvet bag containing controlled substances, a pipe, and packaging material. The defendant was arrested and ultimately convicted of possession of a controlled substance. *Id.* at 104-05.

On appeal of his conviction, the defendant contended that the search of his backpack exceeded the scope of his consent to a search of the car. This court rejected the defendant's argument:

"[The officer] asked for permission to search defendant's car. He did so in response to the fact that (1) defendant's car smelled strongly of marijuana and (2) [the second officer] had just told him—in defendant's presence—that he had located drug paraphernalia. A reasonable person in defendant's position would have understood that the object of [the officer's] request was to search for drugs and the scope of that request included any compartments or containers in the car that might hold them."

*Id.* at 107-08; *see also State v. Quale*, 225 Or App 461, 469, 201 P3d 273 (2009) (where the defendant consented to a

search for weapons and placed no limits on his consent, his consent extended to any place that weapons may have been found, including his backpack); *State v. Helow*, 171 Or App 236, 241-42, 15 P3d 103 (2000), *rev den*, 332 Or 56 (2001) (where the defendant told an officer that he could search her car and its contents for checks, the defendant's consent to search extended to a folded sheet of paper that could have contained checks within its folds).

In this case, Santos told Foster that he had been investigating an incident in which a gun had been used, that the car that she had been driving had been linked to that incident, and that Baker may have been involved in the incident; he then asked for Foster's consent to search the car. Foster agreed to a search of the car, and nothing in the record suggests that she placed any limits on her consent. Here, as in *Harvey*, a reasonable person in Foster's position would have understood that Santos's request for consent to search was a request to search for a gun or other evidence relevant to the menacing incident and to whether Baker had been involved in it. Moreover, because Foster consented to the search and offered no restrictions on the search, the scope of her consent extended to any place that could reasonably contain a gun or any other evidence that connected Baker to the car. The trial court erred when it reached a contrary conclusion.

■ As noted, defendants argue that, even if Foster's consent extended to the car's glove box, the trial court correctly suppressed the evidence because the state did not prove that Foster was authorized to consent to a search of the glove box. *See State v. Surface/Hurley*, 183 Or App 368, 372, 51 P3d 713 (2002) (when the state relies on third-party consent to justify a warrantless search under Article I, section 9, the state must prove that the third party had actual authority to consent to the search). We disagree.

The evidence presented at the hearing demonstrated that Foster was in lawful possession of the car. Santos testified that Foster told him that "Jenny" (whom Foster identified as the car's owner) had given her permission to use the car. Defendants do not contend (and nothing in the record suggests) that the car was stolen or that Foster was operating the car in some manner other than with a key. Defendants do

not explain, and we do not understand, why a person who is lawfully operating a car with the owner's consent and who is authorized to consent to a search of the car nevertheless lacks authority to consent to a search of constituent parts of the car to which the driver normally has access. The trial court erred in suppressing evidence discovered in the glove box of the car on the ground that the search of the glove box exceeded the scope of Foster's consent.

## V. DEFENDANT JAY'S CROSS-ASSIGNMENTS OF ERROR

We turn to defendant Jay's cross-assignments of error, in which he contends that the trial court erred (1) when it concluded that the police lawfully stopped the Caprice and (2) when it failed to suppress evidence of jail visitor logs created after his arrest because the logs were exploitative of his illegal arrest. The state responds that the trial court's conclusions were correct.

We begin with the stop of the Caprice. In reaching its findings of fact, the trial court relied on relevant facts found by the federal district court. As previously noted, because the record before the trial court supports them, those findings bind this court. *Ball*, 250 Or at 486.

On the morning of June 22, 2001, Stradley watched as defendants entered a gray Caprice and drove away. Stradley believed that the Caprice's windows were tinted darker than the legal limit and communicated that belief to Santos, who then followed the Caprice for some distance and drew the same conclusion. He radioed Staul, who was driving a marked police car, and asked Staul to stop the Caprice on the pretext of investigating the tinted windows. When Staul saw the Caprice, he likewise concluded that its windows were tinted darker than the legal limit and conducted a traffic stop. Defendant Jay was driving. The record does not show whether Staul cited Jay for the windows. However, at the suppression hearing, Jay introduced into evidence a certificate from the auto body shop that had tinted the Caprice's windows; the certificate confirmed that the Caprice's windows were tinted only to the degree allowed under the law.

Defendant Jay contends that because, as a factual matter, the Caprice's windows were lawfully tinted, Staul's subjective belief that the windows were not lawfully tinted was not objectively reasonable and that Staul therefore lacked probable cause to stop him. We disagree.

An officer may lawfully stop and detain a person for a traffic violation if the officer has probable cause to believe that a traffic violation has been committed. *State v. Isley*, 182 Or App 186, 190, 48 P3d 179 (2002). Probable cause for a stop exists if, at the time of the stop, the officer's subjective belief that a traffic violation has occurred is objectively reasonable. *Id.* An officer's belief may be objectively reasonable "even if the officer's subjective basis for acting turns out to be incorrect." *State v. Miller*, 345 Or 176, 186, 191 P3d 651 (2008). Thus, if the facts that the officer believed she observed, if true, would have constituted a traffic violation, then the officer's belief that a traffic violation occurred was objectively reasonable. In contrast, if the facts that the officer believed she observed, if true, would not constitute a traffic violation, the officer's belief that a traffic violation occurred was not objectively reasonable.

In *State v. De La Rosa*, 228 Or App 666, 208 P3d 1012 (2009), we applied those principles to circumstances substantially similar to those in this case. There, an officer investigating a drug operation stopped a car based in part on what he believed were windows that were too darkly tinted in violation of the relevant statute. The driver was eventually convicted of four drug offenses. *Id.* at 668. On appeal, she argued, in part, that the initial stop of her car was unlawful because the officer's subjective belief that she had committed a traffic infraction relating to the tinted windows was not objectively reasonable. *Id.* at 670-71. We disagreed, reasoning that, where the window tint was "extremely dark," to the extent that the officer was unable to "make out the silhouettes of anyone inside" the car, the officer's belief was objectively reasonable. *Id.* at 671; *see also, e.g., State v. Hayes*, 99 Or App 387, 389, 782 P2d 177 (1989), *rev den*, 309 Or 441 (1990) (an officer who was informed by dispatch that the defendant's car was not properly registered lawfully stopped the defendant; notwithstanding that the information was

erroneous, it gave the officer "a reasonable basis" for subjectively believing that the car was not properly registered).

Here, Staul testified that he observed that the Caprice's windows were very darkly tinted, causing him to believe that the tinting exceeded the amount permitted by law. The observed darkness of the tint provided Staul with a reasonable basis to believe that the Caprice was being operated in violation of ORS 815.222(2):

> "A person commits the offense of operating a vehicle with illegal window tinting if the person operates a vehicle registered or required to be registered in Oregon that is equipped with window tinting material that is not in compliance with or authorized by ORS 815.221."

Indeed, the certificate that demonstrates that the windows were, in fact, in compliance with ORS 815.221 indicates that the Caprice's windows were tinted to the maximum allowed by law, further demonstrating that Staul's belief, although mistaken, was nevertheless reasonable. The trial court correctly concluded that the stop was lawful.

In his second cross-assignment of error, defendant Jay argues that the trial court erred when it refused to suppress evidence of jail visitor logs that were created as a result of what he asserts was his unlawful arrest. According to defendant Jay, any evidence derived as a result of the logs resulted from the exploitation of his unlawful arrest. Jay's cross-assignment depends on the correctness of the trial court's conclusion that his arrest was unlawful. As discussed above, we are reversing the trial court's ruling to that effect. Accordingly, we need not address this cross-assignment of error.

In summary, the trial court erred in determining that the search of the blue Chevrolet Celebrity exceeded the scope of the driver's consent and in suppressing evidence of the items discovered in that search, as asserted in the state's first assignment of error. The trial court also erred in granting defendants' motion to suppress officer Stradley's testimony and related and derivative evidence, as asserted in the state's second assignment of error. The trial court's rulings

that are the subject of the state's third through fifth assignments of error were based, in part, on the court's erroneous suppression of Stradley's testimony and related and derivative evidence; accordingly, we do not consider those assignments. The trial court did not err in concluding that the stop of the Chevrolet Caprice was lawful or in denying defendant's motion to suppress evidence of jail visitor logs, as asserted in defendant Jay's cross-assignments of error.

Orders dated February 7, 2006, suppressing evidence of items seized following search of 2310 N. Killingsworth, Portland, vacated. Portions of orders dated February 8, 2006, granting defendants' motions to suppress, reversed; otherwise affirmed. Case remanded for reconsideration.