Submitted June 27, 2012, reversed and remanded June 19, petition for review denied October 17, 2013 (354 Or 386)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MANUEL ALEJANDRO MAGANA,
*Defendant-Appellant.*

Clackamas County Circuit Court
CR0901676; A145917 (Control)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JOSE GUADALUPE RAMIREZ RIVERA,
*Defendant-Appellant.*

Clackamas County Circuit Court
CR0901677; A145963

304 P3d 780

Peter Gartlan, Chief Defender, and Morgen E. Daniels, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellants.

John R. Kroger, Attorney General, Anna M. Joyce, Solicitor General, and David B. Thompson, Senior Assistant Attorney General, filed the brief for respondent.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

This is a consolidated appeal by defendant Ramirez-Rivera, who was convicted of one count of unlawful delivery of heroin, ORS 475.850, and by defendant Magana, who was convicted of one count of unlawful manufacture of heroin, ORS 475.846. During an "interdiction exercise," police officers approached Ramirez-Rivera at a bus stop, requesting to search his truck and his person. After they obtained Ramirez-Rivera's address, some officers went to his apartment and encountered Magana. The officers searched the apartment, finding the incriminating evidence at issue in this case. At trial, each defendant filed a separate motion to suppress. Ramirez-Rivera argued that the officers unlawfully stopped him at the bus stop and his subsequent consent to search his truck and person was derived from that unlawful stop. Magana argued that he did not consent to the search of the apartment. The trial court denied both motions to suppress. For the following reasons, we reverse and remand.

We state the facts consistently with the trial court's findings of historical fact, provided that they are supported by constitutionally sufficient evidence in the record, and we assess independently whether those findings support the trial court's legal conclusion. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). Officers Kenagy, Devlin, Castaneda, and Groshon, along with two other law enforcement officers, all part of the Narcotics Task Force, performed an interdiction exercise at a Portland bus stop. According to Kenagy, the purpose of an interdiction exercise is to "stem the flow of narcotics and narcotics currency into and out of the Portland metro area" by working at bus stations and "all of the major public transportation thoroughfares." Kenagy, wearing plain clothes and carrying a concealed weapon, approached a passenger, Rosales-Perez, as he got off the bus, showed his badge, and asked if he could search Rosales-Perez's bag for narcotics and narcotics paraphernalia. Rosales-Perez agreed to the search, and Groshon came with a narcotics canine to search the exterior of his duffle bag; the narcotics canine did not detect anything. Kenagy then requested to search inside Rosales-Perez's duffle bag and pockets, and Rosales-Perez agreed; Kenagy did not find

any contraband. At some point, Kenagy asked for identification, and Rosales-Perez gave Kenagy an identification card, not government-issued, which stated that he lived nearby at an apartment on Webster Road. Kenagy noted the address and handed Rosales-Perez's identification card back to him.

While Kenagy was talking to Rosales-Perez, Devlin saw one of the defendants in this case, Ramirez-Rivera, wave at Rosales-Perez from his pickup truck that was parked at the bus stop. Devlin, wearing plain clothes and carrying his gun underneath his shirt, approached Ramirez-Rivera and explained that he was a narcotics officer. He then asked whether he knew Rosales-Perez. When it became apparent that Ramirez-Rivera did not speak English, Castaneda, who was standing away from Devlin, was brought over to interpret in Spanish. Castaneda was in plain clothes but wearing a "police-issued" vest with a badge and had his gun exposed.

Castaneda then asked whether Ramirez-Rivera was at the bus stop to pick up Rosales-Perez, but Ramirez-Rivera denied knowing Rosales-Perez, explaining that he had gone to a nearby mini-mart to make a money-wire transfer. At some point Devlin asked for Ramirez-Rivera's identification, and Ramirez-Rivera provided him with an identification card that was not a valid Oregon driver's license. Although Ramirez-Rivera was apparently driving without a license, Devlin did not inform him that he was being stopped for a traffic violation and did not cite him for driving without a valid license. Devlin, through Castaneda, also asked Ramirez-Rivera if the officers could search his person and his truck, and he agreed.

After consenting to the search, Ramirez-Rivera stepped out of his truck, and Devlin patted him down for weapons. Groshon then searched the truck with the narcotics canine, and Castaneda searched Ramirez-Rivera and the rear of the truck. At some point, one of the officers conducted a records check on Ramirez-Rivera; it is not clear from the record which officer conducted the check or when it was conducted. Devlin testified that it may have happened after Ramirez-Rivera was standing outside his truck and while Groshon was searching it. None of the officers found any

contraband during the search. While Ramirez-Rivera was standing at the rear of the truck, Castaneda asked where Ramirez-Rivera lived, and Ramirez-Rivera responded that he did not remember his address and provided Castaneda with a money-order receipt, which stated an address that was identical to the address on Rosales-Perez's identification card. Eventually, Ramirez-Rivera admitted that he did know Rosales-Perez.

After the officers exchanged information gathered from Rosales-Perez and Ramirez-Rivera, the officers decided that some of them should visit the address on Webster Road that they had obtained from Rosales-Perez's identification card and Ramirez-Rivera's money-order receipt. Their decision to visit the Webster Road apartment was based on (1) Rosales-Perez's and Ramirez-Rivera's inconsistent statements about whether they knew each other, (2) evidence that they both lived at the same address on Webster Road, and (3) their observations that Ramirez-Rivera and Rosales-Perez had on or with them pictures, cards, and necklaces with images of Jesus Malverde, a purported cultural icon related to narcotics trafficking in the Hispanic community (as well as an icon for poor people in Latin America). Some of the officers agreed to go to the apartment to conduct a "knock-and-talk" interview, which is a conversation with the apartment's occupant during which the officers will remain on the threshold unless they receive permission to enter the apartment.

Devlin asked Rosales-Perez and Ramirez-Rivera if they could stay at the bus stop while some of the officers went to the Webster Road apartment, and they agreed to stay and wait in Ramirez-Rivera's truck. Devlin, along with another officer, waited in their unmarked vehicle about 50 feet from the truck and would occasionally checked on Rosales-Perez and Ramirez-Rivera. Ramirez-Rivera and Rosales-Perez remained at the bus stop for approximately 20 minutes.

Meanwhile, Kenagy and Castaneda, who were now both wearing ballistic vests, went to the Webster Road apartment building along with three other officers and a narcotics dog. Kenagy and Castaneda went up to and knocked on the apartment door, and the other defendant in this case,

Magana, cracked open the door and peeked out to see who was there. When Kenagy and Castaneda identified themselves as police officers, Magana slammed the door, and the officers heard some loud noises inside the apartment. The officers then knocked on the door again, identifying themselves as Portland Police, and, this time, Magana opened the door and stepped out of the apartment. Magana started to close the door behind him, but before he could shut the door, Kenagy asked Magana to put his hands up and patted him down for weapons.

Because Magana did not understand English, Castaneda interpreted the conversation in Spanish. Castaneda testified that he "asked for consent to search * * * the residence for narcotics and asked to use a canine to do so as well" and that Magana's response was that he agreed to the search and "was very calm about it[.]" Kenagy also testified that Magana's response to the officers' request for consent was, "Okay." Kenagy and Castaneda were followed by the three other officers and the narcotics canine. Shortly thereafter, one of the officers found two balls of heroin in the freezer. In addition, the officers later discovered approximately $20,000 in one of the bedrooms.

Kenagy subsequently arrested Magana and advised him of his *Miranda* rights. At some point, Kenagy contacted Devlin, who was still at the bus stop, and requested that Devlin arrest Ramirez-Rivera and Rosales-Perez and bring them to the Webster Road apartment for questioning. When Ramirez-Rivera arrived at the apartment, Kenagy advised him of his *Miranda* rights and began questioning him. While they were at the apartment, both Magana and Ramirez-Rivera admitted that they were roommates and lived with Rosales-Perez. Eventually, both Magana and Ramirez-Rivera made self-incriminating statements.

Both defendants were indicted for one count of unlawful manufacture of heroin, ORS 475.846, one count of unlawful delivery of heroin, ORS 475.850, and one count of unlawful possession of heroin, ORS 475.854. Defendants filed separate motions to suppress evidence. Ramirez-Rivera argued that the officers unlawfully stopped him at the bus stop and any evidence that was obtained from their apartment

was a result of that initial unlawful stop. Magana contended that he did not voluntarily consent to the search of his apartment and, thus, the officers' warrantless search of the apartment was unconstitutional.

The trial court held a hearing on defendants' motions to suppress. At the suppression hearing, the trial court heard testimony from Kenagy, Devlin, Castaneda, and both defendants. The trial court denied both defendants' motions to suppress. As to Ramirez-Rivera's theory that he was unlawfully stopped, the court concluded that his interaction with Devlin and Castaneda initially was "mere conversation" during which the officers developed "reasonable suspicion" that Ramirez-Rivera had committed a traffic infraction or criminal violation by operating a motor vehicle without a valid license. The trial court reasoned that, when the officers "asked further about identification and defendant Ramirez-Rivera presented a receipt with the Webster Road address[,]" "[t]he obtaining of the address under th[o]se circumstances is not subject to suppression or a constitutionally based sanction."[1]

Regarding the encounter between the police and Magana, the court concluded that he had consented to the officers' entry and search of the residence and that there was no indication of any limitations on his ability to consent to a search:

> "THE COURT FINDS that with regard to defendant [Magana] that the officers' basis of concern was legitimate after the initial contact at the door and that a pat-down of defendant [Magana] was a reasonable modest intrusion reasonably related to officer safety. The Court further finds that defendant [Magana] consented to the search of the Webster Road home. The Court finds nothing to suggest that there was any limitation on defendant [Magana's] consent to enter and search the residence."

The court explained from the bench that Magana's consent was "freely given without threat or promise or any assertion

---

[1] The trial court also found that Rosales-Perez and Ramirez-Rivera consented to stay in the truck while the other officers went to the Webster Road apartment. The court ruled that "nothing about the search of the Webster Road apartment derived from an exploitation related to asking [them] to remain at the scene." Defendants do not challenge those decisions.

of improper control by the police and that that consent validly extended to the areas in which the police officers entered and found the drugs and the cash involved."

Magana entered a conditional guilty plea to one count of unlawful manufacture of heroin, reserving his right to appeal the court's ruling on his motion to suppress, ORS 135.335(3), and the court dismissed his other charges. Ramirez-Rivera entered a conditional plea to one count of unlawful delivery of heroin, also reserving his right to appeal the court's evidentiary ruling, and the court dismissed his other charges.

In this consolidated appeal, defendants assign error to the trial court's denial of their motions to suppress, arguing that the evidence seized was gained in violation of Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution.[2] Defendants rely on two arguments preserved for appeal. First, defendants contend that Ramirez-Rivera was unlawfully stopped when Devlin and Castaneda approached him in his parked truck and asked for his identification. Defendants contend that Ramirez-Rivera's subsequent consent to the search of his vehicle was a product of that prior illegal seizure and that the officers procured the money-order receipt thereafter unlawfully. Without the receipt, defendants argue, the officers would not have visited the Webster Road apartment, where the incriminating evidence was discovered. Second, defendants argue that Magana's consent to the search of the apartment was not voluntary. We address each of defendants' arguments in turn.

## THE STOP OF DEFENDANT RAMIREZ-RIVERA

We begin our analysis by considering whether the officers unlawfully stopped Ramirez-Rivera. Article I, section 9, of the Oregon Constitution provides that "[n]o law shall violate the right of people to be secure in their persons, houses, papers, and effects, against unreasonable search,

---

[2] Although defendants cite both the state and federal constitutions on appeal, defendants rely solely on state constitutional cases and failed to develop a separate federal constitutional argument in the trial court or here. In any event, given our disposition of the case, we need not address defendants' federal constitutional argument.

or seizure[.]" For purposes of assessing that constitutional provision, police-citizen encounters are divided into three categories: (1) mere conversation; (2) stops; and (3) arrests. *State v. Ashbaugh*, 349 Or 297, 308-09, 244 P3d 360 (2010). The first category, "mere conversation," is a noncoercive encounter that has no constitutional significance. *Id.* at 308. However, a "stop" is a "temporary restraint on a person's liberty" and is a constitutionally significant seizure for which the officer needs some type of justification. *Id.* at 308-09. To be reasonable, a stop must be justified by reasonable suspicion of criminal activity, *State v. Holmes*, 311 Or 400, 407, 813 P2d 28 (1991), or by an imminent threat of serious physical injury, *Ashbaugh*, 349 Or at 309. Otherwise, the individual has the right to be free from police interference. *Ashbaugh*, 349 Or at 308-09. Thus, our inquiry is two-fold: We first determine whether the officers stopped the defendant. If there was a stop, we then determine whether the officers had reasonable suspicion to justify that stop.

In this case, contrary to the trial court's determination that Devlin and Castaneda's initial contact with Ramirez-Rivera was "mere conversation" and was within the bounds of an investigation of a traffic infraction or criminal violation, defendants contend that Ramirez-Rivera was stopped when Devlin and Castaneda approached him in his parked truck during the interdiction exercise, questioned him, and asked for his identification. They also contend that the officers lacked reasonable suspicion that Ramirez-Rivera had engaged, was engaging, or was about to engage in criminal activity when they did so.

To determine whether a police-citizen encounter constitutes mere conversation or a stop, the Supreme Court has set out the following objective test:

> "A 'seizure' of a person occurs under Article I, section 9, of the Oregon Constitution: (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances *would* believe that (a) above has occurred."

*Ashbaugh*, 349 Or at 316 (emphasis in original). Under that test, a stop has occurred if the officer has manifested a "'show of authority'" that restricts a person's "'freedom of movement.'" *Id*. at 317 (quoting *State v. Rodgers/Kirkeby*, 347 Or 610, 622, 227 P3d 695 (2010)). That determination requires a "fact-specific inquiry into the totality of the circumstances of the particular case[.]" *Id*. at 309-10 (internal quotation marks and citations omitted).

Defendants primarily rely on *State v. Anderson*, 231 Or App 198, 217 P3d 1133 (2009), *adh'd to on recons*, 234 Or App 420, 228 P3d 638 (2010), *rev allowed*, 350 Or 130 (2011), in support of their contention that Ramirez-Rivera was unlawfully stopped. In *Anderson*, three officers approached the defendant and a companion, while they were in their parked car and were about to drive away. 231 Or App at 200, 204. The officers explained that they had been serving a warrant on a nearby apartment and that they were questioning them because they were seen approaching the apartment. *Id*. at 201. One officer asked the defendant, who was sitting on the passenger's side of the car, for identification, and the defendant told the officers that he did not have any identification and gave a false name. *Id*. The officer immediately recognized that the defendant had provided a false name, and the defendant eventually gave the officer his identification card. *Id*. The officer ran a warrant check, discovered that the defendant had an outstanding warrant, and arrested him. *Id*.

We held that the defendant's liberty was significantly restrained before he provided the officer with a false name. *Id*. at 203. At that time, we concluded, the defendant knew that the officers were searching the apartment of one of his acquaintances. *Id*. We concluded that the officer's conduct went beyond "'ordinary social intercourse,' as opposed to conduct that 'would be perceived as * * * non-offensive * * * if it had occurred between two ordinary citizens.'" *Id*. at 203-04 (quoting *Holmes*, 311 Or at 410) (omission in *Anderson*). In support of our conclusion, we stated,

"In 'ordinary social intercourse' one does not, along with two friends, approach strangers who are sitting in a car and preparing to drive away, inform them that suspicious

activity is afoot nearby, and ask them to identify them-selves. Surely an ordinary citizen would consider such con-duct offensive, regardless of the inquisitors' tone of voice."

*Id.* at 204.

Defendants contend that this case is like *Anderson*, because Devlin and Castaneda's encounter with Ramirez-Rivera went beyond mere conversation in that the offi-cers' actions towards him involved a show of authority: he was sitting in a parked car when he was approached by two officers, he was questioned about his connection with Rosales-Perez while he could see Rosales-Perez being patted down and searched by two other officers and a narcotics canine, and then he was asked to provide identification. According to defendants, a reasonable person in Ramirez-Rivera's position would believe, as he did, that he was not free to leave when two officers approached him in the midst of what appeared to be a multi-officer police operation. The state does not attempt to distinguish *Anderson* or address the argument that the initial encounter between the offi-cers and Ramirez-Rivera amounted to a stop, other than by merely asserting that the encounter was not one.[3]

Based on the facts of this case, we conclude that the police officers' initial encounter with Ramirez-Rivera was a stop before they received Ramirez-Rivera's identifica-tion. When Devlin initially approached Ramirez-Rivera, he was in his parked truck and was about to leave the bus stop parking lot. Devlin identified himself as a narcotics detective and asked Ramirez-Rivera whether he knew Rosales-Perez while Ramirez-Rivera could see two other officers, Kenagy and Groshon, and the narcotics canine search his associ-ate for contraband. Shortly thereafter, Castaneda, who was wearing a vest and had his gun exposed, also came up to the side of Ramirez-Rivera's truck and helped Devlin question Ramirez-Rivera, including requesting his identification. We conclude that Ramirez-Rivera's encounter with Devlin and Castaneda within the context of the interdiction exercise

---

[3] The state instead focuses on how the officers obtained the money-order receipt. Before we reach that issue and its potential effect on the admissibility of the evidence obtained during the stop, we must decide the threshold issue—whether the initial stop was unlawful.

was significantly beyond that accepted in "ordinary social intercourse," *Holmes*, 311 Or at 410, and amounted to a show of authority and restraint on his liberty or freedom of movement before Devlin obtained his identification. *See State v. Radtke*, 242 Or App 234, 239-40, 255 P3d 543 (2011).

In *Radtke*, the defendant went to a restaurant to meet a friend. When she arrived, she saw the friend in the backseat of a police car in the parking lot. An officer motioned the defendant over, obtained her name and date of birth, and then questioned her about drugs and weapons. We concluded that a reasonable person in the defendant's position would have believed that her freedom of movement had been restricted because she was the subject of a criminal investigation. *Id.* at 241. We reasoned that "[a] reasonable inference from that sequence of events is that [the officer] took [the] defendant's name and date of birth for the purpose of running a check on her and the reason he had not done so in no way indicated that he was not going to—in other words, that the investigatory process had commenced and was ongoing up to the point of arrest." *Id.* at 240. We relied on several factors that bolstered that inference:

> "First, defendant observed that the person whom she was planning to meet was under arrest, in the 'caged' back seat of a patrol car. Second, there were two officers present and both were armed and in uniform. Third, as noted, in addition to taking her information, [the officer] also questioned defendant about illegal activity, albeit in a calm and nonconfrontational voice."

*Id.*; *see also State v. Soto*, 252 Or App 50, 54, 284 P3d 1254, *rev den*, 353 Or 127 (2012) ("[I]f the defendant would know, in light of an officer's actions, that he or she is the subject of a criminal investigation, then a reasonable person in the defendant's position would believe that his or her freedom of movement had been significantly restricted.").

Here, as noted, Devlin identified himself as a narcotics officer and immediately asked Ramirez-Rivera whether he knew Rosales-Perez, who was being searched by two other officers and a narcotics canine for narcotics and narcotics paraphernalia. Then Castaneda, who had his gun exposed, approached Ramirez-Rivera and asked him

whether he was at the bus stop to pick up Rosales-Perez. And when Ramirez-Rivera denied knowing Rosales-Perez, the two officers continued questioning Ramirez-Rivera, including requesting his identification. At that point, given the context of the two officers' presence—the evident organized, multiofficer narcotics investigation—and their questions, a reasonable person in Ramirez-Rivera's position would have believed that he was under criminal investigation for narcotics-related activity and was not free to leave. Thus, based on the totality of the circumstances, we conclude that the officers' conduct was a show of authority that restricted Ramirez-Rivera's freedom of movement and therefore was a stop.[4]

The next inquiry is whether the officers had reasonable suspicion to justify the stop, which requires us to determine whether the officers subjectively believed that Ramirez-Rivera had "'a connection with criminal activity'" and whether the officers' belief was objectively reasonable. *State v. Jones*, 245 Or App 186, 192, 263 P3d 344 (2011) (quoting *State v. Cloman*, 254 Or 1, 6, 456 P2d 67 (1969)). To be objectively reasonable, an officer's suspicion must be based on specific and articulable facts. *Ehly*, 317 Or at 80. "There must be some facts or circumstances that distinguish the conduct of the individual stopped from that of other individuals who are not stopped[.]" *State v. Ragsdale*, 34 Or App 549, 553-54, 579 P2d 286, *rev den*, 283 Or 503 (1978) (internal quotation marks omitted).

Here, the officers stopped Ramirez-Rivera before they had reasonable suspicion that he had committed a crime, including driving without a valid driver's license

---

[4] Recently, in *State v. Wiener*, 254 Or App 582, 591, 295 P3d 152, *rev pending* (2013), we held that an officer's questions directed to a passenger in a vehicle stopped for a traffic violation about whether he was engaged in criminal activity, by themselves, were insufficient to constitute a stop. In that case, police officers saw the truck in which defendant was a passenger drive away from a house where drug activity was suspected and initiated a traffic stop. *Id.* at 583. While one of the officers conducted a records check on the driver and the defendant, the other officer obtained the driver's consent to search the truck and saw a bag of methamphetamine. *Id.* at 584. We rejected the defendant's argument that the purely verbal conduct at issue—the officer's request to search the car in combination with statements alluding to drug activity at the house—constituted a show of authority that effected an additional, criminal stop. *Id.* at 590-91. This case, however, is distinguishable from *Wiener* because it involves more than purely verbal conduct.

(a misdemeanor). Any subjective belief on the part of the officers that he was engaged in criminal activity was not objectively reasonable. When the officers stopped Ramirez-Rivera, they only knew that he had waved at, but denied knowing, Rosales-Perez, a bus passenger who had agreed to be searched but who did not possess contraband of any type. Devlin only gained reasonable suspicion that Ramirez-Rivera was driving without a license later, after he gave Devlin, in response to a request for identification, an identification card instead of a valid Oregon driver's license. *See, e.g., State v. Cohan*, 227 Or App 63, 71-72, 204 P3d 816 (2009), *rev den*, 349 Or 664 (2011) (officer developed reasonable suspicion that the defendant was driving without a valid driver's license when, in response to a request for identification, he produced his Oregon Identification Card). Accordingly, the officers unlawfully stopped Ramirez-Rivera before the officers found the money-order receipt with the address of the Webster Road apartment.[5]

We now consider the effect of that unlawful stop on the admissibility of the state's incriminating evidence discovered at the apartment on Webster Road. Defendants argue that the police exploited the unlawful stop because they procured the money-order receipt afterwards, during the search of Ramirez-Rivera and the truck, and they would not have visited the apartment without it. Defendants argue that Ramirez-Rivera's consent to search was a product of police exploitation of the unlawful stop and any evidence obtained after the unlawful stop should be suppressed.

The Supreme Court's exploitation test articulated in *State v. Hall*, 339 Or 7, 34, 115 P3d 908 (2005), is controlling. The Supreme Court explained that when an illegal stop precedes a defendant's consent to search, the inquiry

---

[5] We note that the officers' observation of Jesus Malverde images would not have been sufficient to justify the stop. In *State v. De La Rosa*, 228 Or App 666, 674 n 2, 208 P3d 1012 (2009), we acknowledged that, based on the officer's testimony, Jesus Malverde is a purported cultural icon related to narcotics trafficking in the Hispanic community but also celebrated by poor people in Latin America. We noted, however, that we do not consider the officer's observations of items displaying Jesus Malverde images in our reasonable suspicion calculus because those items "that supposedly [have] significance only to Hispanics raises the same kind of serious constitutional concerns as other forms of profiling." *Id*.

into whether the evidence sought to be introduced must be suppressed is guided by a two-step analysis. In the first step, the defendant bears a burden of production. The defendant must establish a "minimal factual nexus—that is, at minimum, the existence of a 'but for' relationship—between the evidence sought to be suppressed and prior unlawful police conduct[.]" *Hall*, 339 Or at 25.

In disputing whether defendants met their burden, the parties make fact-based causation arguments. Defendants contend that the "but for" relationship between the evidence seized at the Webster Road apartment and the unlawful stop of Ramirez-Rivera exists because, but for that stop, the police would not have procured the money-order receipt with the same Webster Road address that was on Rosales-Perez's identification card and, therefore, would not have decided to search the apartment. The state asserts that the record fails to support defendants' contention that the police otherwise would not have searched the apartment.

We conclude, however, that the "but for" relationship exists as a matter of law. In *Rodgers/Kirkeby*, the Supreme Court determined, without discussion, that a defendant meets the initial burden to establish the existence of a minimal factual nexus when the defendant's consent to search was given "during a period of unlawful detention." 347 Or at 629-30; *see also State v. Ayles*, 348 Or 622, 634, 237 P3d 805 (2010) (relying on *Rodgers/Kirkeby*, the Supreme Court concluded that "the existence of a minimal factual nexus is obvious in cases in which the defendant consents to a search (or takes other incriminating action) *during an illegal seizure*" (emphasis in original)). Here, given our determination that Ramirez-Rivera was unlawfully stopped and given the timing of his consent for the police to search him and the truck—after the unlawful stop, while he was in his truck and was being questioned about his relationship with Rosales-Perez, who was being searched by two other officers—as a matter of law, defendants have established the existence of a minimal factual nexus.

At the second step of the analysis, the state bears the burden to prove that the evidence did not derive from the preceding illegality, meaning that the defendant's consent

and the subsequent discovery of evidence was independent of or only tenuously related to the unlawful police conduct. *Hall*, 339 Or at 35. To determine whether the police exploited their illegal conduct to obtain consent to search, courts must engage in a "fact-specific inquiry into the totality of the circumstances to determine the nature of the causal connection between the unlawful police conduct and the defendant's consent." *Id*. That fact-specific inquiry requires courts to look at the following factors:

> "(1) the temporal proximity between the unlawful police conduct and the defendant's consent, (2) the existence of any intervening circumstance, and (3) the presence of any circumstances—such as, for example, a police officer informing the defendant of the right to refuse consent—that mitigated the effect of the unlawful police conduct."

*Id*. If the state can show that the police's illegal conduct did not "significantly affect[ ]" the defendant's consent, then the state has established that suppression is not required. *Id*.

Defendants note that Ramirez-Rivera's consent to search immediately followed the unlawful stop, and there were no intervening or mitigating circumstances to lessen the impact of the officers' unlawful conduct. Defendants further argue that, although the interaction between Ramirez-Rivera and the officers may have been calm, the officers put pressure on Ramirez-Rivera to consent by having numerous officers around him plus additional officers and a narcotics canine searching his associate, Rosales-Perez. In addition, defendants argue that the purpose of the police misconduct was to gain Ramirez-Rivera's consent to a search, because all the officers "were members of the Portland Police Bureau narcotics task force * * * [and] were in the midst of conducting an 'interdiction exercise[.]'"

In response, the state argues that defendants' "exploitation" argument lacks merit because the trial court specifically found that defendant Ramirez-Rivera produced the money-order receipt in response to Castaneda's request for his address; it was not found during the search of his person or truck. In addition, the state asserts that the record does not support defendants' contention that the officers would not have gone to the Webster Road address without finding the money-order receipt.

Although we agree with the state that we are bound by the trial court's finding that Ramirez-Rivera gave the money-order receipt in response to Castaneda's request for his address, the fact that he produced the receipt instead of the police discovering it during the search of his person or his truck does not change this part of our analysis. Oregon courts have applied the exploitation analysis, articulated in *Hall*, in other situations that involved unlawful police conduct followed by the police's discovery of incriminating evidence through means that were not a direct result of a search conducted pursuant to the defendant's consent, including through the defendant's voluntary surrender of incriminating evidence in response to questioning during a seizure. *See, e.g., State v. Thompkin*, 341 Or 368, 379-81, 143 P3d 530 (2006) (applying *Hall* exploitation analysis when the defendant passenger was unlawfully seized during a traffic stop and then voluntarily produced a crack pipe in response to questioning about drugs and weapons); *see also State v. Courtney*, 242 Or App 321, 325, 333-38, 255 P3d 577, *rev den*, 351 Or 401 (2011) (applying *Hall* when, subsequent to the defendant passenger's unlawful seizure during a traffic stop and the defendant's consent to be searched for weapons, the officer observed two glass pipes fall into the space between the passenger seat and the car door as the officer opened the door so the car could be lawfully towed); *State v. Towai*, 234 Or App 292, 297, 288 P3d 601 (2010), *rev den*, 349 Or 664 (2011) (applying *Hall* where the officer's discovery of the evidence did not directly result from the defendant's consent to search his backpack, but instead resulted from the driver's consent to search the car, which the state had conceded was obtained through exploitation of the defendant's unlawful seizure).

Accordingly, we determine whether the state has met its burden to show that the discovery of the money-order receipt and the subsequent search of the apartment was attenuated from the preceding unlawful stop. We have already concluded that the officers' request for the receipt was made during an unlawful stop, and Castaneda testified that he obtained the receipt when Ramirez-Rivera was standing at the back of the truck with Castaneda while another officer was searching the truck. The state does not

make any argument under *Hall* that the officers' conduct did not significantly affect Ramirez-Rivera's decision to provide the receipt in response to the request for his address. In the trial court, the state did not contend that the officers would have gone to the Webster Road apartment even without discovering the money-order receipt. On appeal, the state makes only one argument that the unlawful police conduct had an attenuated factual link to the incriminating evidence that was later discovered at the apartment, namely, that the record fails to support an inference that the officers would not have gone to the apartment and discovered the incriminating evidence absent the money-order receipt. However, that argument fails both legally and factually.

The state's argument regarding the purported absence of evidence implies that defendants bear the burden to show that the officers would not have gone to the apartment but for their discovery of the money-order receipt, yet the state bears the burden to show that the officers would have gone to the apartment even without the discovery of the money-order receipt. *See Hall*, 339 Or at 35 (noting that "the state has the burden to prove that the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct"); *State v. Dimmick*, 248 Or App 167, 176, 273 P3d 212 (2012) (concluding that the state failed to meet its burden to prove that the evidence was not tainted by the officer's unlawful conduct because it did not argue the officer would have been able to search the backpack through other lawful means). And, the state's assertion—that there is nothing in the record to suggest that the police would not have gone to the apartment without the money-order receipt—is contradicted by the record. Kenagy testified regarding the reasons that the officers decided to visit the Webster Road address and explained, without contradiction, that the decision was based, in part, on evidence, *i.e.*, the money-order receipt, that Rosales-Perez and Ramirez-Rivera both lived on Webster Road.

In light of the foregoing, we conclude that the state failed to meet its burden to prove that the evidence they obtained did not derive from the preceding unlawful stop. Therefore, we conclude that the trial court erred in denying defendant Ramirez-Rivera's motion to suppress.

## THE STOP OF DEFENDANT MAGANA

Although defendants present three arguments as to why the incriminating evidence found at the Webster Road apartment should be suppressed as to Magana, we consider just one, *viz.*, that Magana's consent to the search of the apartment was not voluntary, an argument in play in the trial court. Defendants also argue (1) that the police unlawfully seized Magana at the door of his apartment without reasonable suspicion of criminal activity and exploited that unlawful seizure to gain consent, and (2) the evidence obtained at the Webster Road apartment was derived from the unlawful stop of Ramirez-Rivera at the bus stop, which had produced the money-order receipt with the address for the Webster Road apartment. Those other two arguments were admittedly not preserved for appeal and, we conclude, are not subject to our review based on plain error, ORAP 5.45(1).[6]

As for defendants' argument that Magana's consent was not voluntary, the trial court was called on to decide whether Magana was coerced to consent during the "knock and talk" interview. As noted earlier, the trial court ruled that Magana's consent was voluntary because it was "freely given without threat or promise or any assertion of improper control by the police."

On appeal, defendants argue that Magana's consent to search the apartment was involuntary for two reasons. First, they contend that, under the totality of the circumstances, the officers created a coercive atmosphere before requesting his consent to search, such that Magana's consent was involuntary. In addition, they argue that Magana's consent was, at best, "mere acquiescence," "with no real opportunity to decline." *State v. Freund*, 102 Or App 647, 652, 796 P2d 656 (1990) ("Mere acquiescence to lawful authority is not

---

[6] To constitute plain error, the claimed error must satisfy three criteria, one of which is that the error is "'apparent,' meaning the legal point must be obvious, that is, 'not reasonably in dispute.'" *State v. Martin*, 221 Or App 78, 81, 188 P3d 432, *rev den*, 345 Or 418 (2008) (quoting *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990)). We reject defendants' argument that the alleged errors are reviewable as plain error because defendants failed to demonstrate that the legal point, whether Magana's or Ramirez-Rivera's consents to search were the product of police exploitation of a prior unlawful stop or seizure, is not reasonably in dispute.

consent." (Internal quotation marks and citation omitted.)). Because we conclude that Magana's consent was involuntary, we need not address defendants' "mere acquiescence" argument.

We begin our analysis by noting Oregon's long-standing principle that persons have a heightened privacy interest in their homes and "[t]he very purpose of [Article I, section 9, of the Oregon Constitution] was to protect a person's home from governmental intrusions." *State v. Martin*, 222 Or App 138, 142, 193 P3d 993 (2008), *rev den*, 345 Or 690 (2009) (internal quotations marks and citations omitted; brackets in original); *accord, State v. Fair*, 353 Or 588, 600, 302 P3d 417 (2013). The general rule is that "warrantless searches are *per se* unreasonable[,]" but a defendant's consent to search is one of the exceptions to that general rule. *State v. Guzman*, 164 Or App 90, 99, 990 P2d 370 (1999), *rev den*, 331 Or 191 (2000).

The state has the burden of proving, by a preponderance of the evidence, that a defendant's consent to search is voluntary. *Id.* To determine whether a defendant's consent is voluntary, "we examine 'whether, in the light of the totality of the circumstances, defendant's consent was a product of his own free will or was the result of coercion, express or implied.'" *Id.* (quoting *State v. Charlesworth/Parks*, 151 Or App 100, 114, 951 P2d 153 (1997), *rev den*, 327 Or 82 (1998)); *State v. Berg*, 223 Or App 387, 391, 196 P3d 547 (2008) *adh'd to as mod on recons*, 288 Or App 754, 208 P3d 1006, *rev den*, 346 Or 361 (2009). Although we are bound by the trial court's findings of historical fact, so long as there is constitutionally sufficient evidence to support them, *Ehly*, 317 Or at 75, "[t]he determination of whether consent was voluntary is a legal issue that we review independently," *Guzman*, 164 Or App at 99 (internal brackets and quotation marks omitted).

Courts may look to a variety of factors for guidance to determine whether the defendant's consent was voluntary or a result of coercion, such as "whether physical force was used or threatened"; "whether weapons were displayed"; "whether the consent was obtained in public"; "whether the person who gives consent is the subject of an investigation";

"and whether the atmosphere surrounding the consent [was] antagonistic or oppressive[.]" *State v. Larson,* 141 Or App 186, 198, 917 P2d 519, *rev den,* 324 Or 229 (1996). In this case, the state failed to prove, based on the totality of the circumstances, that Magana's consent to search the apartment was voluntary.

When officers went to the apartment on Webster Road, it is unquestionable that they intended to investigate drug activity. The officers were a part of the Narcotics Task Force, whose primary purpose is to investigate illegal drug activity. The officers did not attempt to get a warrant to search the apartment based on probable cause. Instead, the officers went directly to the apartment to conduct a knock-and-talk interview, bringing a narcotics canine with them. The number of officers present outside the apartment, along with the officers' decision to bring the narcotics dog, suggests that the officers' purpose was to gain Magana's consent to search during their contact with him.

At the apartment, the officers' interaction with Magana was outside the bounds of a normal knock-and-talk interview and involved a show of force. There were five officers present at the Webster Road apartment, without guns drawn, and a narcotics canine. All of the officers were wearing ballistic vests. Two of those officers were visible from the front door of the apartment: Kenagy and Castaneda. When Kenagy and Castaneda knocked on the door, Magana cracked opened the door, saw them standing outside the apartment, and immediately slammed the door without saying anything. Magana's reaction to the officers' presence at his home unambiguously indicated that he did not want to talk to the officers. Despite that clear message, Kenagy and Castaneda made a repeated effort to talk to Magana by continuing to knock at his door and identifying themselves as Portland Police. Once Magana opened the door again, he stepped outside the apartment and attempted to close the door. As Magana was closing the door behind him, Kenagy told Magana to put his hands up and patted him down for weapons. The officers did not question Magana about his relationship with Rosales-Perez or Ramirez-Rivera or explain why they were at the apartment. Instead, immediately after the pat-down, Castaneda, who was visibly

armed, asked Magana if the officers could search his apartment with the narcotics canine. That entire interaction occurred within several minutes.

Although the trial court found that Magana was "calm" when he consented to the search, the atmosphere surrounding his consent was aggressive and intimidating: First, the officers made a repeated effort to talk to Magana after he slammed the door. Second, once Magana opened the door, the officers had Magana put his hands up and searched him. Third, the officers immediately asked for consent to search the apartment for drugs with a narcotics dog, without explaining any other reason why they were at the apartment. Last, Magana's consent was obtained while he was in the presence of several officers wearing ballistic vests, with the implication that at least one other officer and the dog were also present for the search and that Magana was the subject of investigation. We conclude that that combination of circumstances made the interaction implicitly coercive.

Although intervening or mitigating circumstances may "purge the taint" of the officers' use of intimidation to gain consent, the record does not demonstrate that those types of circumstances were present in this case. The officers did not give any *Miranda* warnings before Magana's consent to search. Nor did the officers inform Magana that he had the right to refuse consent or to limit the scope of his consent. Although the officers generally have consent-to-search forms that they use, the officers did not provide Magana with any written information, in English or in Spanish, regarding his right to refuse consent. In light of all the foregoing circumstances, Magana's consent to search the apartment was not voluntary, and the officers' search of the apartment violated Article I, section 9, of the Oregon Constitution.

Reversed and remanded.