Submitted on remand from the Oregon Supreme Court April 18, reversed and remanded September 10, 2014

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MANUEL ALEJANDRO MAGANA,
*Defendant-Appellant.*

Clackamas County Circuit Court
CR0901676; A145917 (Control)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JOSE GUADALUPE RAMIREZ RIVERA,
*Defendant-Appellant.*

Clackamas County Circuit Court
CR0901677; A145963

335 P3d 318

Robert D. Herndon, Judge. (Judgment entered May 28, 2010)

Steven L. Maurer, Judge. (Judgment entered June 2, 2010)

Peter Gartlan, Chief Defender, and Morgen E. Daniels, Deputy Public Defender, Office of Public Defense Services, filed the briefs for appellants.

John R. Kroger, Attorney General, Anna M. Joyce, Solicitor General, and David B. Thompson, Senior Assistant Attorney General, filed the briefs for respondent. Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and David B. Thompson, Senior Assistant Attorney General, filed the supplemental briefs.

Before Duncan, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

This case, now before us on remand from the Supreme Court, began as a consolidated appeal by defendants Ramirez Rivera (defendant), who was convicted of one count of unlawful delivery of heroin, ORS 475.850, and Magana, who was convicted of one count of unlawful manufacture of heroin, ORS 487.846. The trial court had denied their respective motions to suppress, and they challenged the rulings on appeal. We reversed and remanded with respect to both Magana and defendant. We agreed with Magana's contention that, when the police had encountered him at the apartment he shared with defendant, he had not voluntarily consented to a search and, thus, the officers' warrantless search of the apartment, where heroin and a large amount of cash were found, was unconstitutional. *State v. Magana / Rivera*, 257 Or App 251, 272, 304 P3d 780 (2013). The Supreme Court denied the state's petition for review as to Magana. *State v. Magana*, 354 Or 386, 314 P3d 964 (2013).

However, the Supreme Court granted the state's petition for review as to defendant. We had reversed as to defendant based on our conclusion that the police had seized him at a bus stop without reasonable suspicion, which then allowed the police to learn information that led them to the apartment. The court vacated our decision and remanded for reconsideration in light of the court's trilogy of opinions in *State v. Backstrand*, 354 Or 392, 313 P3d 1084 (2013); *State v. Anderson*, 354 Or 440, 313 P3d 1113 (2013); and *State v. Highley*, 354 Or 459, 313 P3d 1068 (2013). *State v. Magana/Rivera*, 354 Or 837, 325 P3d 738 (2014). In light of supplemental briefing on remand, we now reverse and remand again, but for a different reason: Magana's involuntary consent and the consequent unlawful, warrantless search of the apartment that he shared with defendant.[1]

---

[1] We agree with the state that we need not reach the issue of whether defendant was seized. Further, as previously noted, although the Supreme Court denied Magana's petition for review, it nonetheless vacated our decision in *Magana/Rivera* in which we had resolved his appeal. *See State ex rel SOSCF v. Williams*, 168 Or App 538, 543 n 5, 7 P3d 655 (2000) (stating that, because we had vacated an opinion, that opinion had "no precedential value"). For that reason, to the extent that it is necessary for us to do so, we adhere to and readopt our reasoning and decision as to Magana as set out in our previous opinion in this case, 257 Or App at 269-72.

We take the facts from the evidence presented at the suppression hearing. *State v. Bistrika*, 261 Or App 710, 711, 322 P3d 583 (2014). Law enforcement officers, all part of the Narcotics Task Force, were performing an interdiction exercise[2] at a Portland bus stop. Officer Kenagy approached a passenger, Rosales-Perez, as he got off the bus. Having obtained consent, the police deployed a narcotics dog and searched Rosales-Perez and his bag. At some point, Kenagy asked for identification, and Rosales-Perez gave Kenagy an identification card showing his residence at an address on Webster Road. The officers did not find any contraband.

Another officer, Devlin, saw defendant wave at Rosales-Perez from his pickup truck that was parked at the bus stop. Devlin approached defendant and explained that he was a narcotics officer. He then asked whether he knew Rosales-Perez. Because defendant did not speak English, Officer Castaneda was brought over to interpret in Spanish. Devlin and Castaneda questioned defendant, who denied knowing Rosalez-Perez.

At some point, Devlin asked for defendant's identification, and defendant provided an identification card. Although defendant was apparently driving without a license, Devlin did not inform him that he was being stopped for a traffic violation and did not cite him for driving without a valid license. The officers instead obtained defendant's consent to a search of his person and his truck. Defendant stepped out of his truck, and Devlin patted him down for weapons. Officer Groshon then searched the truck with a narcotics dog, and Castaneda searched defendant and the rear of the truck. The officers did not find any contraband.

Castaneda also asked defendant where he lived. In response, defendant provided a money-order receipt, which contained the identical Webster Road address as on Rosales-Perez's identification card. Eventually, defendant admitted that he did know Rosales-Perez.

---

[2] One of the officers explained that the purpose of an interdiction exercise is to "stem the flow of narcotics and narcotics currency into and out of the Portland metro area" by working at bus stations and "all of the major public transportation thoroughfares."

After the officers exchanged information gathered from Rosales-Perez and defendant, the officers decided that some of them should visit the Webster Road residence. Their curiosity was "piqued" because of (1) Rosales-Perez's and defendant's inconsistent statements about whether they knew each other, (2) the evidence that they both lived at the same address, and (3) their observations that defendant and Rosales-Perez had items containing images of Jesus Malverde. Kenagy and a number of other officers went to the apartment to conduct a "knock-and-talk" interview, a conversation with the occupant during which the officers remain on the threshold unless they receive permission to enter. The officers did not attempt to obtain a warrant. Kenagy testified that he had no information to believe that defendant and Rosales-Perez were involved in criminal activity.

Kenagy and Castaneda, both wearing ballistic vests, went to the Webster Road apartment building along with three other officers and a narcotics dog. Kenagy and Castaneda went up to and knocked on the door of the apartment where defendant and Magana lived. Magana cracked open the door and peeked out. When Kenagy and Castaneda identified themselves as police officers, Magana slammed the door. The officers heard some loud noises inside the apartment. The officers again knocked on the door, identifying themselves as Portland Police, and, this time, Magana opened the door and stepped out of the apartment. Magana started to close the door behind him, but before he could do so, Kenagy asked Magana to put his hands up and patted him down for weapons. Castaneda "asked for consent to search * * * the residence for narcotics and asked to use a canine to do so as well." Magana's "calm" response was, "Okay." Kenagy and Castaneda were followed by the three other officers and the narcotics dog. The officers found heroin in the freezer and approximately $20,000 in one of the bedrooms.

After arresting Magana, Kenagy asked Devlin to arrest defendant and Rosales-Perez, who had agreed to wait at the bus stop while Devlin and another officer waited nearby. The police took the men to the apartment, where, during questioning, defendant eventually acknowledged

that he, Magana, and Rosales-Perez lived at the apartment, and defendant and Magana made self-incriminating statements. Both defendant and Magana were indicted for one count of unlawful manufacture of heroin, ORS 475.846, one count of unlawful delivery of heroin, ORS 475.850, and one count of unlawful possession of heroin, ORS 475.854.

Magana filed a motion to suppress, contending that he had not voluntarily consented to the search of his apartment. The trial court concluded that he had freely consented to the officers' entry and search of the residence, that there was no indication of any limitation on his ability to consent to a search, and that his consent extended to all areas in which the police found the drugs and cash. Magana entered a conditional guilty plea to one count of unlawful manufacture of heroin, reserving his right to appeal the court's ruling on his motion to suppress, ORS 135.335(3), and the court dismissed his other charges.

Defendant filed a separate motion to suppress evidence, in large part based on the unlawfulness of the stop. Defendant also argued that Magana did not consent or lacked authority to consent to a search of the residence. The trial court denied his motion. As to the encounter at the bus stop, it concluded that defendant's interaction with Devlin and Castaneda was initially "mere conversation" during which the officers developed reasonable suspicion that defendant had committed a traffic infraction or criminal violation by operating a motor vehicle without a valid license. The trial court reasoned that there was no constitutional violation when the officers asked for identification and defendant presented the receipt with the Webster Road address. Defendant then entered a conditional plea, ORS 135.335(3), to one count of unlawful delivery of heroin, reserving his right to appeal the court's ruling, and the court dismissed his other charges.

In *Magana/Rivera*, we concluded that the police had seized defendant under Article I, section 9, of the Oregon Constitution, before they obtained his identification and without reasonable suspicion, and accepted defendant's argument that his subsequent consent to the search of his vehicle was a product of his illegal seizure. 257 Or

App at 264-68. Although the parties on remand have briefed the question whether defendant was seized before police obtained his identification, addressing the *Backstrand* trilogy of cases, our resolution of defendant's appeal no longer relies on defendant's seizure at all. That is because of our holding with respect to the unlawful search of the apartment and defendant's status as a cotenant.

In *Magana/Rivera*, we held that the search of the apartment was unlawful because Magana's consent to the search was not voluntarily given. We began our analysis by noting

> "Oregon's longstanding principle that persons have a heightened privacy interest in their homes and '[t]he very purpose of [Article I, section 9, of the Oregon Constitution] was to protect a person's home from governmental intrusions.' *State v. Martin*, 222 Or App 138, 142, 193 P3d 993 (2008), *rev den*, 345 Or 690 (2009) (internal quotations marks and citations omitted; brackets in original); *accord, State v. Fair*, 353 Or 588, 600, 302 P3d 417 (2013). The general rule is that 'warrantless searches are *per se* unreasonable[,]' but a defendant's consent to search is one of the exceptions to that general rule. *State v. Guzman*, 164 Or App 90, 99, 990 P2d 370 (1999), *rev den*, 331 Or 191 (2000)."

*Magana/Rivera*, 257 Or App at 270. We also explained that courts

> "may look to a variety of factors for guidance to determine whether the defendant's consent was voluntary or a result of coercion, such as 'whether physical force was used or threatened'; 'whether weapons were displayed'; 'whether the consent was obtained in public'; 'whether the person who gives consent is the subject of an investigation'; 'and whether the atmosphere surrounding the consent [was] antagonistic or oppressive[.]'"

*Id.* at 270-71 (citing *State v. Larson*, 141 Or App 186, 198, 917 P2d 519, *rev den*, 324 Or 229 (1996)).

Analyzing the totality of the circumstances, we concluded that Magana's consent to search the apartment was involuntary:

> "When officers went to the apartment on Webster Road, it is unquestionable that they intended to investigate drug activity. The officers were a part of the Narcotics Task

Force, whose primary purpose is to investigate illegal drug activity. The officers did not attempt to get a warrant to search the apartment based on probable cause. Instead, the officers went directly to the apartment to conduct a knock-and-talk interview, bringing a narcotics canine with them. The number of officers present outside the apartment, along with the officers' decision to bring the narcotics dog, suggests that the officers' purpose was to gain Magana's consent to search during their contact with him.

"At the apartment, the officers' interaction with Magana was outside the bounds of a normal knock-and-talk interview and involved a show of force. There were five officers present at the Webster Road apartment, without guns drawn, and a narcotics canine. All of the officers were wearing ballistic vests. Two of those officers were visible from the front door of the apartment: Kenagy and Castaneda. When Kenagy and Castaneda knocked on the door, Magana cracked opened the door, saw them standing outside the apartment, and immediately slammed the door without saying anything. Magana's reaction to the officers' presence at his home unambiguously indicated that he did not want to talk to the officers. Despite that clear message, Kenagy and Castaneda made a repeated effort to talk to Magana by continuing to knock at his door and identifying themselves as Portland Police. Once Magana opened the door again, he stepped outside the apartment and attempted to close the door. As Magana was closing the door behind him, Kenagy told Magana to put his hands up and patted him down for weapons. The officers did not question Magana about his relationship with Rosales-Perez or [defendant] or explain why they were at the apartment. Instead, immediately after the pat-down, Castaneda, who was visibly armed, asked Magana if the officers could search his apartment with the narcotics canine. That entire interaction occurred within several minutes.

"Although the trial court found that Magana was 'calm' when he consented to the search, the atmosphere surrounding his consent was aggressive and intimidating: First, the officers made a repeated effort to talk to Magana after he slammed the door. Second, once Magana opened the door, the officers had Magana put his hands up and searched him. Third, the officers immediately asked for consent to search the apartment for drugs with a narcotics dog, without explaining any other reason why they were at

the apartment. Last, Magana's consent was obtained while he was in the presence of several officers wearing ballistic vests, with the implication that at least one other officer and the dog were also present for the search and that Magana was the subject of investigation. We conclude that that combination of circumstances made the interaction implicitly coercive.

"Although intervening or mitigating circumstances may 'purge the taint' of the officers' use of intimidation to gain consent, the record does not demonstrate that those types of circumstances were present in this case. * * * In light of all the foregoing circumstances, Magana's consent to search the apartment was not voluntary, and the officers' search of the apartment violated Article I, section 9, of the Oregon Constitution."

257 Or App at 271-72.

Defendant argues on remand that, regardless of the legality of defendant's interaction with the police at the bus stop, because we have concluded that the search of the apartment he shared with Magana was unlawful, we also could hold that the evidence should have been suppressed as to defendant for the same reason. Defendant urges us to re-affirm our reversal of the trial court's denial of his motion to suppress on that basis.

For its part, the state acknowledges that it is undisputed that defendant was Magana's cotenant at the apartment where the physical evidence was found. The state concurs that defendant preserved his argument in the trial court. And, the state concedes that it "did not establish that defendant lacked a protected privacy interest in the specific areas of the apartment that were searched." We agree with the parties that our holding that the search of defendant's and Magana's apartment was conducted in violation of Article I, section 9, resolves the suppression issue in defendant's favor. We therefore readopt that portion of our opinion in *Magana/Rivera* in which we concluded that the search of the apartment was unlawful, 257 Or App at 269-72, and we reverse and remand on that basis with respect to defendant.

Reversed and remanded.